# United States Court of Appeals
### For the Eighth Circuit

_____

No. 17-3588
_____

David Kasiah

*Plaintiff - Appellant*

v.

Crowd Systems, Inc.

*Defendant*

Gilbert Carter; Kansas City Board of Police Commissioners

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: September 27, 2018
Filed: February 14, 2019

_____

Before SMITH, Chief Judge, MELLOY and STRAS, Circuit Judges.

_____

MELLOY, Circuit Judge.

A concertgoer who was injured when an off-duty police officer lifted him over a five-foot barrier and dropped him on his neck asks us to reverse the district court's[1] order granting summary judgment to the officer and the board of police commissioners on his 42 U.S.C. § 1983 claims. We affirm.

## I. Background

## A. Appellant's Injury

Except where noted, the following facts are undisputed or presented in a light most favorable to the appellant. On September 27, 2013, Appellant David Kasiah attended the Buzz Beach Ball concert in Kansas City, Missouri. While there, he engaged in several acts of "crowd surfing." According to Kasiah, crowd surfing involved being hoisted onto fellow concertgoers' shoulders at the back of the venue and then being passed hand to hand overhead by them and others toward the stage. Some time after one these crowd-surfing episodes, Kasiah was dancing behind a woman when he "bumped into her." The woman became upset and began yelling at him. Kasiah tried to ignore her, and, after a few seconds, they resumed their separate dancing. Kasiah then crowd surfed again, whereupon he returned and started dancing behind the woman. He bumped into her a second time, and she responded by yelling much more fiercely. After about thirty seconds of yelling, the woman turned to the man she was with and appeared to voice her frustration. She then ran off to talk to security personnel, and the man and Kasiah exchanged "looks."[2]

---

[1]The Honorable Beth Phillips, United States District Judge for the Western District of Missouri.

[2]In a deposition, Kasiah explained that the look the man gave him was a look that seemed to say, "Sorry about [the woman] freaking out about this. . . . [S]he's making me do this." Elsewhere, Kasiah called the look the man gave a "stare." Kasiah explained that the exchanged looks were all that ever happened between him and the man—the man made no threatening gestures to Kasiah, nor did he clench his fist or square up to Kasiah in a boxer stance.

While all of this was going on, Appellee Gilbert Carter, an off-duty police officer for the Kansas City Police Department ("KCPD"), was working as a security guard for Crowd Systems, Inc. ("CSI"), the company providing security for the event. He was standing behind an approximately five-foot tall metal barrier separating the crowd from the stage. A CSI employee approached Carter and explained that it looked like a fight might break out between Kasiah and another man. Carter then stepped onto a step approximately two feet off the ground, which put the top of the barrier at his waist. From there, Carter watched Kasiah and the other man for a moment and called his colleague, Detective Kevin White, over to help him. White was also an off-duty KCPD police officer working for CSI.

As White drew near, Carter spoke to one of the patrons who reported that Kasiah had been causing trouble all day. Carter then saw what he believed to be a "disturbance in the crowd" caused by the two men and motioned for Kasiah to come to him. Kasiah walked toward Carter, who lunged to grab Kasiah as Kasiah got close enough. Kasiah avoided the grab and stepped or leaned back, away from Carter. The crowd suddenly surged forward, and Kasiah was pushed toward Carter. Carter then grabbed Kasiah by the shirt and the arm, made a slight adjustment to his grip, and proceeded, with White's assistance, to pull Kasiah up and over the barrier.[3] Kasiah

---

[3]Lifting someone over the barrier to remove him from a concert was, apparently, not an uncommon practice among CSI security guards. White recalls doing it "all the time" when he worked at other events. Officers did it, he explained, to remove people whom CSI identified as needing to leave for any given reason. He said that it "may not be the easiest way" to remove a person from an event or "the smartest thing to do" alone, but he did recall doing it with help previously and "[n]ever [having] any issues."

In this instance, Carter and White pulled Kasiah up, dragging his torso along the barrier somewhat. They then grabbed Kasiah's legs. Kasiah's body appears to have never been more than a foot above the barrier. Nevertheless, at one point his legs were higher in the air than his head.

was approximately five feet, eleven inches tall and weighed around 160 pounds. Carter was a "large," five-foot-four-inch, "stocky," wide-shouldered man. White had "a smaller-build," was approximately five feet, five inches tall, and appeared to be in his "late 40s [or] early 50s."

As Carter and White pulled Kasiah over the barrier, White began to lose his grip. Kasiah was basically perpendicular to the barrier at the time and not resisting. Without White's help to support Kasiah's lower body, Carter lost his balance and began to fall from the platform. Carter then "pushed, turned, or 'threw'" Kasiah away from him. Both men fell to the ground. Kasiah landed on his head and shoulder and fractured two vertebrae in his neck. Carter landed next to Kasiah or slightly on top of Kasiah's lower body. Kasiah cried out that there was something wrong with his neck, so Carter and White ensured that Kasiah received immediate medical attention. Carter later charged Kasiah with disorderly conduct.

## B. Procedural History

Two years later, Kasiah brought suit against CSI and Carter in Missouri state court for assault and battery, general negligence, vicarious liability, negligent hiring, training, and retention, and punitive damages. Nearly a year later, he amended his petition to add Appellee Kansas City Board of Police Commissioners ("the Board") as a party. He also added claims under 42 U.S.C. § 1983 for wrongful arrest and excessive force in violation of the Fourteenth Amendment and the Missouri constitution. The defendants removed the case to the district court, whereupon several things happened. First, Kasiah settled his claim against CSI. Second, the district court dismissed some of Kasiah's claims and disposed of others through summary judgment—these included all but the wrongful arrest, excessive force, assault and battery, and general negligence claims. None of the dismissals or prior summary judgment orders are before us on appeal. Third, the parties completed discovery. Finally, Carter and the Board filed motions for summary judgment on the

remaining claims, arguing that Carter was entitled to qualified immunity and that the Board could not be held derivatively liable for his alleged excessive use of force.

The district court granted summary judgment in two orders. Relevant to this appeal, the district court concluded that Carter: (1) did not use excessive force in violation of clearly established constitutional law; and (2) was immune from the state-law tort claims under the doctrine of official immunity. Regarding the claims against the Board, the district court stated that Kasiah agreed summary judgment for the wrongful arrest claim was appropriate.[4] The district court also held that the Board was not derivatively liable on the excessive force claim because Carter did not use excessive force. Alternatively, the district court held that "[e]ven if Carter's use of force was unconstitutional, [the Board was] entitled to summary judgment" because the violation did not result from an official policy or the Board's failure to train or supervise Carter. Kasiah timely filed a notice of appeal.

## II. Discussion

Kasiah argues that the district court erred when it granted summary judgment in favor of Carter and the Board on his claims that: (1) Carter used excessive force in violation of the Fourth Amendment; (2) Carter committed assault and battery and was generally negligent under Missouri law; and (3) the Board was derivatively liable as a municipality for Carter's use of excessive force. We review a grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party. See Eggers v. Wells Fargo Bank, N.A., 899 F.3d 629, 632 (8th Cir. 2018).

---

[4]On appeal, Kasiah does not dispute that he so agreed. Nor does he now argue that the district court's decision on the wrongful arrest claim was somehow inappropriate.

## A. Excessive Force

Kasiah first asserts that Carter used excessive force against him in violation of the Fourth Amendment. The district court analyzed whether any of three "distinct 'uses of force'" constituted excessive force. These uses of force were: (1) Carter grabbing Kasiah; (2) Carter lifting Kasiah over the barrier; and (3) Carter "throwing" Kasiah to the ground. The district court concluded that none of the uses of force were unconstitutionally excessive. For the reasons discussed below, we agree.

The Fourth Amendment, as applied to the states by the Fourteenth Amendment, protects individuals from "unreasonable searches and seizures" by government officials. U.S. Const. amend. IV. An officer who uses excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen" acts unreasonably, making his use of force unconstitutional. Graham v. Connor, 490 U.S. 386, 395 (1989). To determine whether an officer has used excessive force, a court must consider, "based on the perspective of a reasonable officer on the scene, 'whether the officer['s] actions are "objectively reasonable" in light of the facts and circumstances confronting [him].'" Wenzel v. City of Bourbon, 899 F.3d 598, 601–02 (8th Cir. 2018) (quoting Ellison v. Lesher, 796 F.3d 910, 916 (8th Cir. 2015)). The court "evaluate[s] the objective reasonableness of the use of force by looking at the particular circumstances of each case, including 'the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officer or others, and whether he [wa]s actively resisting arrest or attempting to evade arrest by flight.'" Neal v. Ficcadenti, 895 F.3d 576, 580–81 (8th Cir. 2018) (second and third alterations in original) (quoting Wertish v. Krueger, 433 F.3d 1062, 1066 (8th Cir. 2006)). The court does not consider the question of whether an officer used excessive force "as 'judged . . . with the 20/20 vision of hindsight.'" Id. at 580 (quoting Hollingsworth, 800 F.3d at 989).

-6-

Here, we conclude that no reasonable jury could find that Carter's uses of force were objectively unreasonable. Regarding the first use of force, the grab, the district court noted that it had previously determined Carter had probable cause to arrest Kasiah for disorderly conduct. Kasiah has not appealed nor does he dispute that determination. The district court therefore concluded, and we agree, that it was reasonable for Carter to grab Kasiah. An officer must be permitted to grab the arrestee and put him in handcuffs when effectuating an arrest. See Graham, 490 U.S. at 396 ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion . . . to effect it."). That conclusion is strengthened by the fact that Kasiah points to no evidence in the record to support a claim that the grab was anything more than what Graham permits.

The second use of force, the lift, was also objectively reasonable. An officer effectuating an arrest need not take action devoid of all risk of harm to the arrestee when moving or attempting to move that arrestee to another location. See, e.g., Boude v. City of Raymore, 855 F.3d 930, 933–34 (8th Cir. 2017) (holding that an officer who physically removed a non-compliant, intoxicated woman from her vehicle acted in an objectively reasonable manner); Ryan v. Armstrong, 850 F.3d 419, 427–28 (8th Cir. 2017) (concluding that the efforts made by officers to remove a severely mentally agitated detainee from his cell were objectively reasonable). Indeed, an officer need not even "pursue the most prudent course of conduct" when doing so. Church v. Anderson, 898 F.3d 830, 833 (8th Cir. 2018) (quoting Retz v. Seaton, 741 F.3d 913, 918 (8th Cir. 2014)); see also Aipperspach v. McInerney, 766 F.3d 803, 806 (8th Cir. 2014) (noting that "[w]e are hesitant to second-guess the 'split-second judgments' of officers working in 'tense, uncertain, and rapidly evolving situation[s]'" (citation omitted)). What matters is that the officer acted reasonably "in light of the facts and circumstances confronting [him]." Graham, 490 U.S. at 397.

Here, Carter acted reasonably. Having apprehended Kasiah, the natural next move for Carter was to remove Kasiah from the concert. Lifting him over the barrier, while potentially risky, was a quick solution and had been done on previous occasions. Indeed, lifting Kasiah helped Carter avoid any difficulty or delay he would have faced had he attempted to get Kasiah, a person he had probable cause to believe was guilty of disorderly conduct, through a noisy crowd at a noisy rock concert and to an exit. Moreover, Carter, a "large," "stocky," wide-shouldered man, was physically capable of lifting the non-resisting, 160-pound Kasiah up and over a five-foot barrier, especially where White was available to assist him. Given these facts, the prevalence of the practice among CSI security guards without incident, and our well-settled case law that "an officer need not pursue the most prudent course of conduct," Church, 898 F.3d at 833 (citation omitted), we hold that it was objectively reasonable for Carter to lift Kasiah over the barrier.

The final use of force, the throw, was also objectively reasonable. The parties agree that White lost his grip on Kasiah's legs as Kasiah was coming over the barrier. They also agree that this resulted in Carter losing his balance, causing Carter and Kasiah to fall toward the ground. It was only then, they stipulate, that Carter "pushed, turned or 'threw'" Kasiah away from him. "Throwing" Kasiah, therefore, was the result of Carter's fall, not some malicious act on the part of Carter.

In his brief, however, Kasiah disagrees as to the meaning of his stipulation. He argues that the record shows that Carter intentionally[5] threw Kasiah, apparently

---

[5]What Kasiah means by the word "intentionally" is unclear. From the way he uses it in his brief, Kasiah seems to be referring to something more than merely intending for a certain result to occur. Carter obviously intended to throw Kasiah off of him in that sense; that fact is not in dispute. What Kasiah appears to be talking about when he uses the word "intentionally" is something more akin to malice—as in, Carter threw Kasiah, intending harm to Kasiah. Such a claim, however, is unsupported by the record.

believing that Carter's state of mind makes the throw objectively unreasonable. The test we apply, however, is an objective one. See Wenzel, 899 F.3d at 601–02. We are to ask whether a reasonable officer in Carter's position would have thrown Kasiah off of him as the two were falling to the ground, not whether Carter subjectively intended to harm Kasiah. See Graham, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."). And we conclude that the answer is "yes." A reasonable officer in Carter's position would have been concerned with preventing injury to himself and the suspect as they fell on top of each other. Redirecting the suspect so that he would not fall on the officer, therefore, would be a natural thing to do. Thus, despite Kasiah's argument that Carter intentionally threw him, a fact which Carter does not dispute, we do not agree that Carter's throw was objectively unreasonable and therefore excessive force.

In any event, even if we could find a constitutional violation in any of these uses of force, Kasiah has failed to meet his burden of showing that Carter violated a right that was clearly established. See Church, 898 F.3d at 832 (explaining that the burden of showing the violation of a clearly established right for qualified immunity purposes is on the plaintiff). We therefore conclude that Carter is entitled to qualified immunity on Kasiah's excessive force claims.

## B. State Tort Claims

Kasiah next asserts that the district court erred in granting Carter summary judgment on Kasiah's assault and battery and general negligence claims. The district court reasoned that summary judgment for Carter was appropriate because he was immune from those claims based on the Missouri doctrine of official immunity. We agree.

The Missouri doctrine of official immunity "protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts." Southers v. City of Farmington, 263 S.W.3d 603, 610 (Mo. 2008) (en banc). This protection is available unless the employees' "conduct is willfully wrong or done with malice or corruption." Id. The doctrine also applies when plaintiffs bring suit for certain intentional torts like assault and battery. See, e.g., Boude, 855 F.3d at 934–35 (upholding a grant of summary judgment based on official immunity for negligence and battery claims); DaVee v. Mathis, 812 S.W.2d 816, 827 (Mo. Ct. App. 1991) (holding that the doctrine of official immunity applied to an assault charge made against police officers). A police officer who decides to use force against a person "has the benefit of official immunity," Boude, 855 F.3d at 935 (quoting Fonesca v. Collins, 884 S.W.2d 63, 66 (Mo. Ct. App. 1994)), because "[a]n 'officer's decision to use force in the performance of his duties is discretionary,'" id. (quoting Davis v. White, 794 F.3d 1008, 1013 (8th Cir. 2015)).

Here, we hold that the official immunity doctrine applies. Carter is a police officer. The parties do not dispute that he had probable cause to arrest Kasiah for disorderly conduct. Carter decided to use force to remove Kasiah from the concert, which is a discretionary act under Missouri law. Boude, 855 F.3d at 935. Therefore, in general, Carter is immune from liability for the Missouri state tort claims Kasiah brought against him.

Kasiah argues, however, that Carter acted with malice, so official immunity should not apply. To support his argument, Kasiah points to the facts that "Carter did not observe a fight or any other altercation" and that "Kasiah complied with [Carter's] direction to approach." Kasiah does not explain, however, how these facts, in light of all the other facts, could support a conclusion that Carter acted with malice. Moreover, nothing in the record supports such a claim. We hold that Carter did not act with malice. The doctrine of official immunity applies.

-10-

## C. Derivative Liability

Lastly, Kasiah argues that the Board should be held derivatively liable as a municipality for Carter's actions. The district court concluded that the Board could not be held liable because Carter had not violated the Constitution and, alternatively, "the constitutional violation was not the result of official policy or a deliberate[ly] indifferent failure to train or supervise." We agree with the district court's first conclusion and need not address the second.

The Board cannot be held liable for Carter's actions because Carter did not violate the Constitution. We have repeatedly said that "'there must be an unconstitutional act by a municipal employee' before a municipality can be held liable." Webb v. City of Maplewood, 889 F.3d 483, 487 (8th Cir. 2018) (quoting Russell v. Hennepin Cty., 420 F.3d 841, 846 (8th Cir. 2005)). Where we conclude that Carter committed no unconstitutional act, the Board cannot be held liable.

## III. Conclusion

Accordingly, we affirm the district court's judgment.

_____