# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1469
_____

Jody Lombardo; Bryan Gilbert

*Plaintiffs - Appellants*

v.

City of St. Louis; Ronald Bergmann, Sergeant, individually and in his official capacity as an officer for the St. Louis City Police Department; Joe Stuckey, Officer, individually and in his official capacity as an officer for the St. Louis City Police Department; Paul Wactor, Officer, individually and in his official capacity as an officer for the St. Louis City Police Department; Michael Cognasso, Officer, individually and in his official capacity as an officer for the St. Louis City Police Department; Kyle Mack, Officer, individually and in his official capacity as an officer for the St. Louis City Police Department; Erich vonNida, Officer, individually and in his official capacity as an officer for the St. Louis City Police Department; Bryan Lemons, Officer, individually and in his official capacity as an officer for the St. Louis City Police Department.; Zachary Opel, Officer, individually and in his official capacity as an officer for the St. Louis City Police Department; Jason King, Officer, individually and in his official capacity as an officer for the St. Louis City Police Department; Ronald Degregorio, Officer, individually and in his official capacity as an officer for the St. Louis City Police Department.

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: July 30, 2021
Filed: June 29, 2022
_____

Before COLLOTON, SHEPHERD, and ERICKSON, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

This matter comes to us on remand after the Supreme Court vacated our previous opinion, Lombardo v. City of St. Louis, 956 F.3d 1009 (8th Cir. 2020), vacated, 141 S. Ct. 2239 (2021) (per curiam), which affirmed the district court's[1] grant of summary judgment in favor of defendants, the City of St. Louis (the City) and certain St. Louis Metropolitan Police Department (SLMPD) officers, on claims arising from the death of Nicholas Gilbert while in SLMPD custody. In our previous opinion, we concluded that the district court properly determined that the officers were entitled to qualified immunity on claims alleged by Gilbert's parents, Jody Lombardo and Bryan Gilbert (together, Lombardo), because the officers did not apply unconstitutionally excessive force in restraining Gilbert and that, in the absence of an underlying constitutional violation, the City could not be liable for an alleged unconstitutional policy or failure to train its officers. The Supreme Court granted Lombardo's petition for certiorari, vacated our judgment, and remanded the case for further consideration. Lombardo v. City of St. Louis, 141 S. Ct. 2239 (2021) (per curiam).

On remand, the Supreme Court directed us "to employ an inquiry that clearly attends to the facts and circumstances" of the incident between Gilbert and the officers in considering "whether the officers used unconstitutionally excessive force or, if they did, whether Gilbert's right to be free of such force in these circumstances was clearly established at the time of his death." Id. at 2242. We now conclude that the officers are entitled to qualified immunity because the right in question was not clearly established at the time of Gilbert's death and the City is not liable for a policy

_____

[1]The Honorable Noelle C. Collins, United States Magistrate Judge for the Eastern District of Missouri, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

of deliberate indifference in the absence of a clearly established constitutional right. Accordingly, we affirm the judgment of the district court.

I.

As we did in our previous opinion, we recite the facts in the light most favorable to Lombardo, the non-moving party. Walton v. Dawson, 752 F.3d 1109, 1114 n.1 (8th Cir. 2014). The events giving rise to this action occurred on December 8, 2015, when SLMPD officers arrested Gilbert on suspicion of trespassing and occupying a condemned building and for failing to appear in court for an outstanding traffic ticket. After Gilbert's arrest, officers brought Gilbert to the "holdover" in the SLMPD central patrol station. The holdover is a secure holding facility where prisoners are temporarily housed before being transferred to the St. Louis City Justice Center, the City's jail facility. The holdover has a booking area, a main holding cell to house prisoners before they are booked, and a cell block with eight individual cells to house prisoners once they have been booked. Gilbert was initially placed in the main holding cell until officers conducted the booking process, during which time the 5-foot-3-inch, 160-pound Gilbert was cooperative. Notably, during the booking process, Gilbert checked "no" on a form questioning whether Gilbert had any medical condition of which officers should be made aware. Once officers completed the booking process, officers placed Gilbert in one of the individual cells.

After Gilbert was placed in an individual cell, officers in the holdover observed him beginning to engage in unusual behavior. Gilbert waved his hands in the air, rattled the bars of his cell, threw his shoe, and bobbed up and down. Officer Jason King then observed Gilbert tie an article of clothing around the bars of his cell and his neck, after which Officer King verbalized that Gilbert appeared to be trying to hang himself. Officers Paul Wactor, Ronald DeGregorio, and Joe Stuckey were in the holdover at the time of Officer King's warning; Officer Wactor immediately left the area to notify a supervisor, while Officer DeGregorio observed Gilbert with clothing tied around his neck and around the bars of his cell before he, too, tried to notify a supervisor. Upon hearing Officer King's warning, Officer Stuckey

responded to Gilbert's cell, followed by Officer DeGregorio and Sergeant Ronald Bergmann, a supervisor who had entered the holdover and was informed that Gilbert was attempting to harm himself.

When Officer Stuckey reached Gilbert's cell, he did not observe Gilbert with any clothing tied around his neck. Nevertheless, based on Officer King's stated observation, Officer Stuckey began to handcuff Gilbert. Officer Stuckey was only able to place a handcuff on Gilbert's left wrist before Gilbert began struggling. The struggle continued between Gilbert and Officer Stuckey but grew to include Officer DeGregorio and Sergeant Bergmann. The officers brought Gilbert to a kneeling position with his upper body lying across a concrete bench in the cell. Officer Stuckey, with Sergeant Bergmann's assistance, then secured the handcuff around Gilbert's right wrist. Gilbert did not remain subdued for long: Gilbert tried to stand up; began thrashing; struck his head on the concrete bench, sustaining a laceration to his forehead; and kicked his legs, striking Officer Stuckey in the groin area. Officer Stuckey left the cell, and Sergeant Bergmann called for someone to bring leg shackles to further restrain Gilbert.

Officers Wactor and King responded to Sergeant Bergmann's request for leg shackles; Officer Wactor brought the shackles to Gilbert's cell, and Officer King assisted him in placing the shackles on Gilbert's legs. Sergeant Bergmann also requested medical assistance, and Officer King left the cell and radioed dispatch to request emergency medical services (EMS), explicitly mentioning Gilbert's "possible psychotic issues." Officer Stuckey left the holdover and called out for assistance with a combative subject, after which the holdover alarm, indicating that an officer is in need of assistance in the holdover, was activated. Officer Stuckey remained outside of the holdover for several minutes to compose himself and did not reenter Gilbert's cell.

Several officers responded to the holdover alarm, including Officer Kyle Mack, who entered the cell and observed the remaining officers struggling to control Gilbert. At that time, Gilbert was still positioned over the concrete bench and was

both handcuffed and shackled. Officer Mack relieved Officer DeGregorio, who was tiring from the struggle, and took hold of Gilbert's left arm, attempting to stop Gilbert from thrashing and hitting his head against the concrete bench. Officer DeGregorio then left the cell to catch his breath. Officer Mack assisted Officer Wactor and Sergeant Bergmann in moving Gilbert from the bench to a prone position on the floor in an attempt to better control Gilbert.

Once Gilbert was in the prone position on the floor, Sergeant Bergmann was relieved by Officer Zachary Opel, who had entered the cell to assist in controlling Gilbert. Officer Opel relieved Sergeant Bergmann by taking control of Gilbert's right side. Sergeant Bergmann, who was also growing exhausted from the struggle, exited the cell. Officers Michael Cognasso, Bryan Lemons, and Erich vonNida, who had also responded to the call for assistance and entered the cell, were also involved in attempting to bring Gilbert under control. After observing Gilbert thrashing his body and kicking officers with his shackled legs, Officer Cognasso put his knees on the back of Gilbert's calves to prevent Gilbert from further striking the officers. Officer Lemons similarly placed his knee on one of Gilbert's legs to prevent him from kicking, while Officer vonNida held Gilbert's arm or leg to prevent Gilbert from continuing to thrash his body. Gilbert continued to resist, and he raised his chest up off the floor and told officers to stop because they were hurting him.

Throughout the course of the struggle, officers controlled Gilbert's limbs at his shoulders, biceps, legs, and lower or middle torso. Officers allegedly applied pressure to Gilbert's back despite SLMPD instructions to its officers that pressing down on the back of a subject in a prone position can cause suffocation and in spite of well-known police guidance that, as soon as a suspect is handcuffed, officers should remove him from his stomach. The officers did not respond to Gilbert's complaints, nor did they appear to recognize that Gilbert's struggles could be due to oxygen deficiency, something well-known police guidance cautions officers to look for, rather than a continued desire to disobey commands. After 15 minutes of

struggling while in the prone position,[2] Gilbert stopped resisting, and officers rolled him from his stomach to his side.

At some point while he was in the prone position, Gilbert stopped breathing. Officer Lemons later testified that when Gilbert stopped resisting, the officers all stood up and Officer Lemons first observed that Gilbert was not breathing. Officer Mack rolled Gilbert from his side to his back and checked Gilbert's pulse. While Officer Mack was initially able to locate a pulse, he was eventually unable to find one. Officer Mack requested that someone retrieve the Automated External Defibrillator (AED) and updated Sergeant Bergmann about Gilbert's condition, after which Sergeant Bergmann radioed dispatch to upgrade the EMS request to "urgent." Officer Wactor began performing chest compressions on Gilbert and, along with Officer Mack, performed rescue breathing. Officers vonNida and Opel returned to the cell and attempted to revive Gilbert with the AED, but the AED never registered a shockable heart rhythm. Officers Mack and Wactor continued to perform chest compressions and rescue breathing until first responders arrived and took over. Ultimately, an ambulance transported Gilbert to the hospital, where he was pronounced dead.

---

[2]The district court concluded that it was "not possible to determine from the record exactly how long Mr. Gilbert was prone," and that the defendants' estimate of fewer than ten minutes was "supported by the undisputed timing of the calls to EMS and other undisputed facts," but the court nonetheless assumed a period of fifteen minutes "for purposes of ruling" on the motion. R. Doc. 92, at 34 & n.18. Our first opinion assumed a period of fifteen minutes, 956 F.3d at 1012, 1015, and so did the Supreme Court, 141 S. Ct. at 2240, so we apply that assumption here. We note, however, that the plaintiffs' evidence on duration is that the entire "event" involving Gilbert—including "getting him into restraints" and "several pleas for EMS"—lasted "fifteen plus minutes." R. Doc. 67-40, at 25. The record includes calls to EMS indicating that the prone position began sometime after 6:15 p.m. (when Gilbert was still positioned over the concrete bench) and ended before 6:27 p.m. (when Gilbert had been placed on his side for some period of time, and an officer notified EMS that the detainee may not be breathing). R. Doc. 78, ¶¶ 66, 72, 96.

Post-mortem examination and testing revealed that Gilbert had a large amount of methamphetamine in his system and significant heart disease. The St. Louis City Medical Examiner's autopsy report categorized the manner of death as accidental and determined that the cause of death was arteriosclerotic heart disease, exacerbated by methamphetamine and forcible restraint. The autopsy report also noted that Gilbert had contusions and lacerations on his face and upper and lower extremities, a small contusion on his left shoulder area, and a fractured sternum. Lombardo secured a second expert report, which opined that Gilbert's cause of death was forcible restraint inducing asphyxia.

Lombardo filed suit under 42 U.S.C. § 1983, asserting 20 claims against Sergeant Bergmann and Officers Cognasso, DeGregorio, King, Lemons, Mack, Opel, Stuckey, vonNida, and Wactor (collectively, the officers) and the City. By the summary judgment stage, the only remaining claims were those alleged against each officer individually for excessive force and those alleged against the City for an unconstitutional policy resulting in a violation of Gilbert's constitutional rights and a failure to train that amounted to deliberate indifference. The officers and the City moved for summary judgment on these claims, which the district court granted. The district court concluded that the officers were entitled to qualified immunity because Lombardo failed to show that there was a clearly established Fourth Amendment right to be free from the use of prone restraint in this context at the time the incident occurred. Further, because the officers were entitled to qualified immunity, the district court concluded that the City could not be held liable for the unconstitutional-policy and failure-to-train claims.

II.

Lombardo asserts that the district court erroneously concluded that the officers were entitled to qualified immunity on the Fourth Amendment excessive force claim. "We review a district court's qualified immunity determination on summary judgment de novo, viewing the record in the light most favorable to [the non-moving party] and drawing all reasonable inferences in her favor." Krout v.

<u>Goemmer</u>, 583 F.3d 557, 564 (8th Cir. 2009) (emphasis omitted).  In considering a claim of qualified immunity, we apply the familiar two-prong inquiry: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  <u>Mitchell v. Shearrer</u>, 729 F.3d 1070, 1074 (8th Cir. 2013). We have the "discretion to decide which of the two prongs of qualified-immunity analysis to tackle first."  <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 735 (2011).

Although we decided the initial iteration of this appeal on the grounds that Lombardo failed to demonstrate a violation of a constitutional right, we now resolve this appeal by relying on the clearly established prong of the qualified immunity analysis.[3]  The Supreme Court has cautioned that "[i]n general, courts should think hard, and then think hard again" before deciding a constitutional question that need not be resolved to dispose of a case.  <u>Camreta v. Greene</u>, 563 U.S. 692, 707 (2011). Given the intensive factual nature of this case, and the "longstanding principle of judicial restraint . . . that courts avoid reaching constitutional questions in advance of the necessity of deciding them," we consider only whether the right was clearly established because it is dispositive to this appeal.  <u>Lyng v. Nw. Indian Cemetery Protective Ass'n</u>, 485 U.S. 439, 445 (1988).

"To be clearly established, a legal principle . . . must be 'settled law' . . . [that is] clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."  <u>Hanson as Tr. for Layton v. Best</u>, 915 F.3d 543, 548 (8th Cir. 2019) (alterations in original) (quoting <u>Dist. of Columbia v. Wesby</u>, 138 S. Ct. 577, 589-90 (2018)).  "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question

_____

[3]Although we decide this appeal on the clearly established prong, we note that this Court has never held, nor do we now hold, that "the use of a prone restraint— no matter the kind, intensity, duration, or surrounding circumstances—is *per se* constitutional so long as an individual appears to resist officers' efforts to subdue him."  See <u>Lombardo</u>, 141 S. Ct. at 2241.  Instead, in each case, we engage in a fact-intensive inquiry, paying "careful attention to the facts and circumstances of each particular case."  <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989).

-8-

beyond debate. Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." De La Rosa v. White, 852 F.3d 740, 745 (8th Cir. 2017) (quoting Mullenix v. Luna, 577 U.S. 7, 12 (2015) (per curiam)). "Clearly established law is 'dictated by controlling authority or a robust consensus of cases of persuasive authority.'" Lane v. Nading, 927 F.3d 1018, 1022 (8th Cir. 2019) (quoting Wesby, 138 S. Ct. at 589-90).

The Supreme Court has never addressed whether prone restraint generally, or a particular use of prone restraint, more specifically, is unconstitutional. And the Supreme Court has never answered the question of whether a right may be clearly established without a Supreme Court case specifically recognizing it. See City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019) (per curiam) ("[A]ssuming without deciding that a court of appeals decision may constitute clearly established law for purposes of qualified immunity," and concluding that "the Court of Appeals' formulation of the clearly established right was far too general"). Thus, assuming, as the Supreme Court has, that a court of appeals decision may constitute clearly established law, the precedent in this area is insufficient to demonstrate that the facts in this case show a violation of a clearly established right of a detainee to be free from prone restraint while resisting.

Far from being a constitutional question beyond debate, "[t]his court has not deemed prone restraint unconstitutional in and of itself the few times we have addressed the issue." Hanson, 915 F.3d at 548. In Hanson, we confronted a scenario involving the death of a subject after officers used prone restraint on the resisting man and attempted to subdue him with knee strikes and by holding down his legs, lower back, and head. Id. at 546. The officers in Hanson also put a spit mask on the subject after he began spitting at the officers, and, after he continued to resist while in prone restraint, one officer pressed the subject's shoulders to the ground while another held the subject's thighs. Id. at 546-47. In concluding that the officers were entitled to qualified immunity due to the lack of a clearly established right, we stated that, under the cases in this circuit addressing prone restraint, "there is no clearly established right against the use of prone restraints for a suspect that has been

resisting." Id. at 548. Further, we concluded that "the fact-intensive qualified immunity analyses in comparable appellate cases have yet to produce a sufficiently particularized 'robust consensus' about prolonged prone restraint." Id. (citation omitted); see, e.g, Giannetti v. City of Stillwater, 216 F. App'x 756, 760, 762 (10th Cir. 2007) (holding that officers' use of prone restraint against resisting misdemeanor detainee coupled with an officer's use of his knee to place pressure on detainee's back was objectively reasonable when detainee, who was mentally ill and obese, was held in prone position for nearly 20 minutes, voiced her distress to no avail, and ultimately died from the encounter). Our recitation of the law set forth in Hanson in 2019 remains unchanged. It thus follows that, in this Circuit, the right to be free from prone restraint when resisting was not clearly established in 2015 when the incident with Gilbert occurred.

Further, as we recognized in Hanson, there is no robust consensus of persuasive authority that would render the right clearly established. Decisions from sister circuits finding specific uses of prone restraint to be a violation of a clearly established right involve differing factual scenarios, rendering them inapplicable to the specific right at issue here. For instance, in Weigel v. Broad, the Tenth Circuit concluded that the use of prone restraint and applied pressure to a subject's body, including his back, was an unreasonable use of force and violated clearly established law. 544 F.3d 1143, 1148, 1152-55 (10th Cir. 2008). But this holding was premised on the fact that the officers continued to apply pressure to the subject after he was already subdued and had stopped struggling. Id. at 1152. Similarly, in Champion v. Outlook Nashville, Inc., the Sixth Circuit held that it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." 380 F.3d 893, 903 (6th Cir. 2004). There, officers were lying on the suspect "like how wrestlers do in the ring" while every eyewitness said that they did not see the suspect struggling. Id. at 897-98. In Drummond v. City of Anaheim, the Ninth Circuit held that officers were not entitled to qualified immunity because "kneeling on the back and neck of a *compliant* detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in

need of air violates clearly established law."  343 F.3d 1052, 1062 (9th Cir. 2003) (emphasis added).  Each of these cases is distinct because they involve instances where the subject had ceased resisting while officers were still applying force to a subject in prone position.

Finally, in Simpson v. Hines, the Fifth Circuit held that the use of force was excessive and malicious where ten officers simultaneously entered a detainee's jail cell after strategizing before entry, one officer put his arm around the detainee's neck, and an officer, nicknamed "Beef" due to his large size, sat on the detainee's chest.  903 F.2d 400, 401-03 (5th Cir. 1990).  Further, once the detainee was in prone position, he was compliant, begged for help, screamed, was motionless by the time officers left the cell, and remained in his cell in that position until the next morning when he was discovered deceased.  Id. at 402.  Again, Simpson involves a subject who became compliant once in the prone position, unlike Gilbert, who offered sustained resistance even in the prone position, and also involves a situation where officers left the detainee motionless in his cell overnight, in stark contrast to the officers' calls here for medical assistance both after Gilbert sustained a laceration to his head and again immediately after they observed that Gilbert had stopped breathing.  Because these cases all have significant distinctions from the facts at issue here, they cannot serve as a robust consensus of persuasive authority rendering the right to be free from prone restraint while resisting clearly established.

Given the foregoing, Gilbert's right to be free from prone restraint while engaged in ongoing resistance, even where officers applied force to various parts of his body, including his back, was not clearly established in 2015 when the incident with Gilbert occurred.  Because the right at issue was not clearly established, the officers are entitled to qualified immunity.  The district court thus did not err in granting the officers' motion for summary judgment based on qualified immunity.

## III.

Lombardo also argues that the district court erred in granting summary judgment to the City on the unconstitutional-policy and failure-to-train claims. Lombardo alleges that the City's policy for restraining detainees in holding cells is facially unconstitutional and caused a violation of Gilbert's rights and that the City's failure to train its officers or enact constitutional policies amounts to deliberate indifference. We apply a de novo standard of review to a district court's grant of summary judgment even where qualified immunity is not involved. See Moyle v. Anderson, 571 F.3d 814, 817 (8th Cir. 2009). "Where the municipality has not directly inflicted an injury, however, 'rigorous standards of culpability and causation must be applied,' and a showing of deliberate indifference is required." Szabla v. City of Brooklyn Park, 486 F.3d 385, 394 (8th Cir. 2007) (en banc) (citation omitted). And a deliberate indifference claim fails in "[t]he absence of clearly established constitutional rights," so-called "'clear constitutional guideposts' for municipalities in the area." Id. (citation omitted). "[T]he lack of clarity in the law precludes a finding that the municipality had an unconstitutional policy at all, because its policymakers cannot properly be said to have exhibited a policy of *deliberate* indifference to constitutional rights that were not clearly established." Id. Because we have concluded that the constitutional right at issue here was not clearly established, Lombardo cannot prevail on her claims against the City. The district court thus did not err in granting summary judgment to the City.

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

_____