# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-1650
_____

Matthew Cartia; Autumn Adams

*Plaintiffs - Appellants*

v.

Bradley Beeman, in his official and individual capacity; Mason McNail, in his official and individual capacity; Kevin Gugliano, in his official and individual capacity; Timothy Livingston, in his official and individual capacity; Rebecca A. Carroll, in her official and individual capacity; Katie Brooks, in her official and individual capacity; John Cottle, in his official capacity as the Sheriff of Lincoln County, Missouri and in his individual capacity; Lincoln County, Missouri; Lincoln County Sheriff's Department; Lincoln County Jail

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: January 10, 2024
Filed: December 10, 2024
_____

Before LOKEN, KELLY, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

Officers arrested Matthew Cartia and Autumn Adams when they tried to interfere with a police investigation. The question is whether those officers, along with others who worked at a local jail, are immune from suit. A magistrate judge, acting by consent of the parties, *see* 28 U.S.C. § 636(c)(1), concluded that the answer was yes. We affirm the grant of summary judgment in part, reverse it in part, and remand for further proceedings.

I.

When Cartia learned that officers were searching his parents' house, he and Adams drove over to check it out. But as they started up the driveway, with a cellphone in hand recording audio and video, Officer Timothy Livingston stopped them to explain that they were interfering with a police investigation.

The encounter drew the attention of Officer Bradley Beeman, who ordered the couple to stay back. To reinforce the point, he gestured as though he were drawing a do-not-cross line over the driveway. Cartia responded by reminding them that they were on video and demanding their names and badge numbers.

As the officers began walking back toward the house, Cartia kept pestering them. At some point, Officer Livingston pulled out his badge, which prompted Cartia to walk forward to get it on video, across the imaginary do-not-cross line. Despite Livingston's order to go "back, over there," he would not budge.

At that moment, Officer Beeman decided to arrest Cartia, who said, "[d]o not touch me, sir." Undeterred, Beeman pulled Cartia's hands behind his back and handcuffed him. As he did so, Adams reached forward, causing Officer Livingston to pull her back. Cartia called him a "fucker" for "touch[ing] [his] girlfriend."

From there, the situation took a turn for the worse. Officer Beeman used a "hip-toss" maneuver to take Cartia to the ground. He then used his knee to keep him down. Meanwhile, Cartia hurled expletives, yelled that he could not breathe, and

accused Beeman of "hit[ting] [him] in the face." When Adams pleaded with Beeman to "stop," Officer Livingston grabbed her by the arm and held her back. Livingston, along with Officer Kevin Gugliano, who had just arrived on the scene, decided to arrest her too. As they ordered her to turn around, she shouted that her arrest was "bullshit" and "not fucking fair."

The cellphone camera captured only some of what happened. It missed the takedown, and ended with Cartia on the ground, held down by Officer Beeman's knee in his back and hand on his neck. He claims that he was restrained for several minutes more, long enough for Officer Gugliano to get involved. When Cartia called one of the officers a "bitch," Beeman allegedly smacked and punched him in the head.

The next step was to get Cartia into the back of a police car. But rather than allowing him to get in on his own, Officer Gugliano forced him into the backseat by allegedly slamming his head into the door frame. Angry, Cartia called Gugliano a "f'ing scumbag and a piece[-]of[-]shit cop." Gugliano responded by opening the car door, choking Cartia, and calling him a "piece of shit" that needed to "[s]hut the fuck up."

Once at the jail, Cartia found himself in yet another heated encounter, this time with two corrections officers: Rebecca Carroll and Katie Brooks. Cartia claims he was compliant the entire time, but he admits that he argued with the officers. They eventually strapped him to an "isolation chair" for 10 to 15 minutes.

After the charges against Cartia and Adams were dropped, the couple decided to sue nearly every officer they encountered. *See* 42 U.S.C. § 1983. They also sued Lincoln County for having an allegedly illegal policy that allowed the mistreatment to occur. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). They raise a host of constitutional and state claims.

The defendants, for their part, moved for summary judgment. *See* Fed. R. Civ. P. 56. The officers relied on qualified and official immunity, while Lincoln County argued that it had no policy or custom making it liable for the acts of its officers. The magistrate judge granted the summary-judgment motion in its entirety.

## II.

We review the summary-judgment ruling de novo, viewing the record in the light most favorable to Cartia and Adams and drawing all reasonable inferences in their favor. *See N.S. ex rel. Lee v. Kan. City Bd. of Police Comm'rs*, 35 F.4th 1111, 1113 (8th Cir. 2022). If even the "plaintiff-friendly version of the facts" entitles the officers to summary judgment, we will affirm. *Id.*

## A.

The constitutional claims against the individual officers come first. Most rely on the Fourth Amendment, including the claim that the officers used excessive force against them before, during, and after their arrests. Cartia makes a similar claim against the corrections officers at the county jail, except pretrial detainees must sue under the Fourteenth Amendment, not the Fourth Amendment.

Regardless of the source, these claims are subject to "a qualified-immunity defense . . . if: (1) the plaintiff-friendly version of the facts fails to establish a constitutional violation; or (2) the law at the time did not clearly establish the right." *Morgan-Tyra v. City of St. Louis*, 89 F.4th 1082, 1085 (8th Cir. 2024). Although the magistrate judge made the right call on many of the claims, a few should have survived summary judgment.[1]

_____

[1]Other claims were destined to fail from the start. One is the excessive-force claim against Officer Mason McNail, who they now concede did not use force against either of them. Officer Beeman likewise did not touch Adams, nor did Officer Livingston make any contact with Cartia. No contact, no force, no claim. *See Roberts v. City of Omaha*, 723 F.3d 966, 974–75 (8th Cir. 2013).

1.

One of those mixed bags is Cartia's Fourth Amendment claim. In evaluating whether the officers used excessive force, we look at whether their conduct was objectively reasonable. *See Graham v. Connor*, 490 U.S. 386, 397 (1989); *see also Morgan-Tyra*, 89 F.4th at 1085–86. The analysis "requires careful attention to" several factors, including "the severity of the crime at issue, whether the suspect pose[d] an immediate [safety] threat . . . , and whether he [wa]s actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. In weighing them, we must keep in mind that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof." *Id.* As the Supreme Court has put it, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of [our] chambers,' violates the Fourth Amendment." *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

"There are multiple defendants and acts to unpack here." *Beard v. Falkenrath*, 97 F.4th 1109, 1119 (8th Cir. 2024); *see McReynolds v. Schmidli*, 4 F.4th 648, 655 (8th Cir. 2021) (explaining that "we must review each officer's actions separately"). The first time the officers laid a hand on Cartia was when he crossed the imaginary boundary on the driveway. Initially, all they wanted to do was handcuff him. But when he became argumentative, as the video shows, Officer Beeman used a hip-toss maneuver to bring him under control. *See Scott v. Harris*, 550 U.S. 372, 378, 381 (2007) (instructing courts to "view[] the facts in the light depicted by [a] videotape," even if it "quite clearly contradicts the version of the story told by" the plaintiff).

Cartia thinks that the takedown was too aggressive under the circumstances, but our cases largely point the other way. Consider *Ehlers v. City of Rapid City*, 846 F.3d 1002 (8th Cir. 2017). There, much like what happened here, an individual approached officers to question their actions. *See id.* at 1007. Ignoring a command "to step back," he continued to move toward them while "ask[ing] more questions." *Id.* Once he refused "to put his hands behind his back," an officer took him to the ground by his "neck and shoulder." *Id.*

-5-

Although the individual suffered shoulder and knee injuries, we held that the takedown "did not violate a constitutional right" because "[a] reasonable officer . . . would interpret [the] behavior as noncompliant." *Id.* at 1011. The same is true for Cartia. *See Kohorst v. Smith*, 968 F.3d 871, 877 (8th Cir. 2020) (explaining that an "arm-bar takedown and . . . pushing down of [an arrestee], who at a minimum appeared to be resisting and was not complying with commands, d[id] not rise to the level of force required to constitute a constitutional violation").

Other cases establish that, at a minimum, Officer Beeman could not have violated a *clearly* established right. In *Blazek v. City of Iowa City*, for example, we affirmed the grant of qualified immunity after an officer "use[d] . . . a forceful throw during handcuffing." 761 F.3d 920, 923 (8th Cir. 2014). *Kelsay v. Ernst* came out the same way based on the lack of "clearly established" law at the time ruling out "a takedown maneuver to arrest a suspect who [had] ignored [an officer's] instruction . . . and continued to walk away." 933 F.3d 975, 980 (8th Cir. 2019) (en banc).

Cases that have come out differently share a key distinction: none involved an individual who was noncompliant like Cartia. In *Montoya v. City of Flandreau*, for example, the suspect "was not threatening anyone, was not actively resisting arrest, and was not attempting to flee." 669 F.3d 867, 871 (8th Cir. 2012). Likewise, in *Shannon v. Koehler*, a bar owner neither "threaten[ed] anyone," nor "resist[ed] arrest," so it was unreasonable for an officer "to use more than de minimis force against him." 616 F.3d 855, 863 (8th Cir. 2010). The lesson from these cases is that an officer may not forcefully take down a nonviolent and nonthreatening suspect who neither resists arrest nor attempts to flee. *See Montoya*, 669 F.3d at 873; *Shannon*, 616 F.3d at 863.

Cartia, on the other hand, had *already* interfered with a police investigation and *was* not cooperating. After he ignored warnings to stay back, the officers could have concluded that "somewhat more force [was] reasonably . . . required" to stop

-6-

him. *Wertish v. Krueger*, 433 F.3d 1062, 1066–67 (8th Cir. 2006). At a minimum, given the mix of cases in this area, "existing precedent . . . ha[d] [not] placed the . . . constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted). The exact circumstance when qualified immunity applies.

## 2.

The same goes for the decision by Officers Beeman and Gugliano to hold Cartia down by his legs, back, and neck while they subdued him. *See Blazek*, 761 F.3d at 925 (describing each "discrete use of force" as a separate "consideration under the Fourth Amendment"); *see also McReynolds*, 4 F.4th at 655. By then, Cartia had hurled expletives at the officers, including calling one of them a "fucker," and refused to follow instructions.

Neither officer violated a clearly established right. *See Quraishi v. St. Charles County*, 986 F.3d 831, 835 (2021) (making clear that civil-rights plaintiffs "have the burden to show that their right was clearly established at the time of the alleged violation"). If anything, our cases suggest just the opposite. *See, e.g.*, *Wertish*, 433 F.3d at 1065 (rejecting an excessive-force claim even though the officer "took . . . to the ground" and "climbed on top of [a] prone [suspect]"); *cf. Ryan v. Armstrong*, 850 F.3d 419, 428 (8th Cir. 2017) (concluding that officers were entitled to qualified immunity for "us[ing] the weight of their bodies to restrain [a pretrial detainee] for approximately *three minutes*" (emphasis added)); *Lombardo v. City of St. Louis*, 38 F.4th 684, 692 (8th Cir. 2022) (holding it "was not clearly established in 2015" that an inmate had a right "to be free from prone restraint while . . . officers applied force to various parts of his body" for *15 minutes*). For that reason, they get the benefit of qualified immunity, at least up to that point.

## 3.

Officers Beeman and Gugliano did more, however, than just restrain Cartia. According to him, Beeman struck and punched him in the face while he was down

on the ground. Then, once he was back on his feet, Gugliano allegedly slammed his head into the frame of a car door before choking him. By then, he claims to have been in handcuffs and no longer resisting. The recording had also stopped, so we must accept these plaintiff-friendly facts as true.[2] *See Scott*, 550 U.S. at 378, 381.

We have long held "that when a person is subdued and restrained with handcuffs, a gratuitous and completely unnecessary act of violence is unreasonable and violates the Fourth Amendment." *Blazek*, 761 F.3d at 925 (citation omitted). Although this rule is phrased in general terms, our cases applying it to "similar facts" placed these officers on "notice that [their] specific use[s] of force [were] unlawful." *Kisela v. Hughes*, 584 U.S. 100, 105 (2018).

One example is *Krout v. Goemmer*, in which officers "kicked and punched" an arrestee "several times" while he was on the ground. 583 F.3d 557, 566 (8th Cir. 2009). A witness specifically reported seeing an "officer punch[] him in the head area," just like Officer Beeman allegedly did here. *Id.* According to *Krout*, "[i]t was clearly established" by then "that this type of gratuitous force against a suspect who is handcuffed, not resisting, and fully subdued is objectively unreasonable." *Id.*

It is even more clearly established now. A suspect's "right[] to be free from excessive force [is] violated if officers choke, kick, or punch [him] when [he is] restrained, not fighting, and not resisting." *Tatum v. Robinson*, 858 F.3d 544, 552 (8th Cir. 2017); *see Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011) (explaining that an officer acted unreasonably by "kick[ing] [the arrestee] several times on both sides of his body, although he was restrained on the ground and offering no resistance"). With *Tatum* on the books nearly a year earlier, Officers

_____

[2]It makes no difference that these facts come from Cartia himself rather than a neutral, third-party witness. *See Argenyi v. Creighton Univ.*, 703 F.3d 441, 446 (8th Cir. 2013) ("A party's own testimony is often self-serving, but the mere fact that [his] factual testimony is favorable to his legal claim does not render it incompetent." (citation omitted)); *see also* Fed. R. Civ. P. 56(c)(1)(A) (requiring a party to "cit[e] to . . . depositions" and other "materials in the record").

-8-

Beeman and Gugliano would have "known for certain that the[ir] conduct was unlawful" and that, once they crossed the line identified in that case, they would no longer be "immune from liability" no matter how many expletives came their way. *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017); *see Shannon*, 616 F.3d at 865.

4.

Adams now gets her turn. She brought excessive-force claims against Officers Livingston and Gugliano. According to her, they injured her shoulder by pulling her arms and then forcing her to the ground. Or, as she describes it, "manhandling" her.

Regardless of the label, they did not violate a clearly established right. Start with Officer Livingston's decision to grab her. Even crediting her testimony that she reached out for Cartia's cellphone, a reasonable officer could have interpreted the act as an attempt to interfere with the arrest or as aggression posing "an immediate threat." *Graham*, 490 U.S. at 396. Either way, Officer Livingston did not go too far by grabbing her arm and pulling it back. *See McManemy v. Tierney*, 970 F.3d 1034, 1039 (8th Cir. 2020) (noting that an officer may respond with force "even if [the person] ha[s] an innocent reason" for acting out (citation omitted)).

Pulling her to the ground presents a closer call. Close calls are the calling card of qualified immunity, when "[e]xisting precedent" does not "put the issue beyond debate." *Molina v. City of St. Louis*, 59 F.4th 334, 338 (8th Cir. 2023) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). And here, to the extent there is *any* answer, it favors the officers, not Adams.

One case on their side is *Kasiah v. Crowd Systems, Inc.*, which involved an off-duty police officer who grabbed a crowd-surfing concertgoer "by the shirt and the arm" and "pull[ed] [him] up and over [a] barrier." 915 F.3d 1179, 1182 (8th Cir. 2019). We concluded that nothing the officer did was objectively unreasonable

because he "must be permitted to grab [an] arrestee and put him in handcuffs when effectuating an arrest." *Id.* at 1184.

Another is *Kelsay*, which we briefly discussed above. There, an officer "ran up behind [a woman], grabbed her arm, and told her to 'get back here.'" *Kelsay*, 933 F.3d at 978. When she kept moving away, he "placed [her] in a bear hug" and "threw her to the ground"—a more aggressive maneuver than what happened here. *Id.* We concluded that qualified immunity was available anyway. *See id.* at 982; *see also Blazek*, 761 F.3d at 925 (explaining that "grabb[ing] [the] plaintiff's arm" and "twist[ing] it around [his] back" did not violate a clearly established right, even though doing so caused a shoulder injury). If the officers in *Kelsay* and *Kasiah* were immune, then Officers Livingston and Gugliano must be too.

Adams chiefly relies on *Kukla v. Hulm* in urging us to come out the other way. 310 F.3d 1046 (8th Cir. 2002). In that case, an officer forced a *non-resisting* arrestee "against his truck, twisted his arm, and raised it high behind his back" before handcuffing him so tightly "that [it] broke his wrist." *Id.* at 1050. To make matters worse, no one loosened the handcuffs "for fifteen minutes despite his repeated complaints." *Id.*

Two major differences exist here. First, unlike the suspect in *Kukla*, Adams began resisting almost immediately, the moment she reached toward Cartia and continued to shout expletives rather than "turn[ing] around" for handcuffing when ordered to do so. Second, the injuries here were less severe than in *Kukla*, suggesting that less force was used. The point is that it would not have provided "fair and clear warning" to either officer that what they were doing violated a clearly established right. *Kisela*, 584 U.S. at 105 (citation omitted); *see Blazek*, 761 F.3d at 924 ("The absence of any resistance and the use of handcuffs to break the suspect's wrist distinguish *Kukla* . . . .").

5.

Back to Cartia. After he arrived at the Lincoln County Jail, corrections officers Rebecca Carroll and Katie Brooks decided to strap him into an "isolation chair" for 10 to 15 minutes. He claims that doing so clearly violated the Fourteenth Amendment, which "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham*, 490 U.S. at 395 n.10.

To prevail, he needs "*objective* evidence" that use of an isolation chair was "not rationally related to a legitimate governmental objective" or was "excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (emphasis added). Cartia comes nowhere close to making either showing.

For one thing, he admits that his own decision to mouth off led to the use of the isolation chair. Prisons and jails must "have substantial discretion to devise reasonable solutions" to address behavioral issues that jeopardize the "safety and order" of the facility. *Id.* at 399 (citation omitted) (noting "the legitimate interests in managing a jail"). Also important are the type and length of the restraint. *See id.* at 397 (considering "the relationship between the need for . . . force and the amount . . . used" and whether the force was "temper[ed]" or "limit[ed]"). Here, it was brief and did not result in any injuries. *Cf. Hope v. Pelzer*, 536 U.S. 730, 737–38 (2002) (handcuffing an inmate to an outside hitching post for hours at a time rose to the level of cruel and unusual punishment). The Constitution does not prohibit placing misbehaving detainees in the correctional equivalent of a timeout. *Cf. Ingraham v. Wright*, 430 U.S. 651, 674 (1977) ("There is, of course a de minimis level of imposition with which the Constitution is not concerned.").

B.

The municipal claims against Lincoln County end in the same place. *See Monell*, 436 U.S at 690–91. According to Cartia and Adams, "unwritten custom[s]" allowed officers to use excessive force against them. To win on a municipal-liability

-11-

claim like this one, they had to show: (1) "the existence of a continuing, widespread, [and] persistent pattern of unconstitutional misconduct"; (2) "deliberate indifference to or tacit authorization of such conduct by . . . policymaking officials after notice . . . of th[e] misconduct"; and (3) causation, meaning "that the custom was a moving force behind the constitutional violation[s]." *Meier v. City of St. Louis*, 78 F.4th 1052, 1057–58 (8th Cir. 2023) (citation omitted).

Cartia and Adams have not identified a custom. They point to the sheer number of excessive-force lawsuits brought against Lincoln County over the past 10 years, but they provide no details about any of them, including whether they were successful. Without more, the existence of a "municipal custom of permitting or encouraging excessive force" is just speculation. *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (explaining that "the mere existence of previous citizens' complaints" is not enough).

Nor do they have evidence that the Lincoln County Sheriff, a "policymaking official[]," ignored "unconstitutional misconduct." *Meier*, 78 F.4th at 1058. They claim he effectively admitted to doing so during his deposition, but all he did was answer hypothetical questions. And each one of his responses tracked the law: reasonableness depends on the surrounding facts, including the level of resistance encountered. *See Graham*, 490 U.S. at 396. The Fourth Amendment requires nothing more.

III.

Different analysis, but much the same story for the assortment of state claims in the case. Among them were assault and battery, malicious prosecution, false imprisonment, and negligence. Missouri law recognizes immunity for government officials, but only for their "discretionary acts or omissions." *Brandy v. City of St. Louis*, 75 F.4th 908, 917 (8th Cir. 2023) (citation omitted).

Each of the acts in this case was discretionary. *See Boude v. City of Raymore*, 855 F.3d 930, 934–35 (8th Cir. 2017) (reviewing the issue de novo). All along the way, from the initial decision to use force to placing Cartia in the isolation chair, officers "retain[ed] . . . discretion" and exercised "judgment." *State ex rel. Morales v. Alessi*, 679 S.W.3d 467, 472 (Mo. banc 2023).

Official "immunity ends," however, "where bad faith or malice begins." *N.S.*, 35 F.4th at 1115. The Missouri Supreme Court has equated bad faith to "conscious wrongdoing," a "dishonest purpose," or "ill will." *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 447 (Mo. banc 1986). Malice is similar, except it involves "wantonly" disregarding a duty while "intend[ing] to be prejudicial or injurious." *Boude*, 855 F.3d at 935 (quoting *Twiehaus*, 706 S.W.2d at 447).

Gratuitously beating Cartia after subduing him creates a reasonable inference that the officers "actual[ly] inten[ded] to cause injury." *Green v. City of St. Louis*, 52 F.4th 734, 741 (8th Cir. 2022) (quoting *Blue v. Harrah's N. Kansas City, LLC*, 170 S.W.3d 466, 479 (Mo. Ct. App. 2005)). Officer Beeman slapped and then punched Cartia in the head while he was down on the ground. Then, just a few minutes later, Officer Gugliano allegedly choked him after slamming his head into the frame of a car door. On the assault-and-battery and negligence claims arising out of these actions, a jury will have to decide whether either acted in bad faith or with malice. *See Div. of Emp. Sec. v. Bd. of Police Comm'rs*, 864 F.3d 974, 980 (8th Cir. 2017) (explaining that "a jury could find that the officers acted with the prohibited bad faith or malice" because the plaintiff "was complying with the officers' demands" when they "punched and shot" him). If so, official immunity would pose no barrier to tort liability.

There is not enough in the record, on the other hand, for the remaining state claims to survive. *See Boude*, 855 F.3d at 935. As we have explained before, "conclusory allegations . . . [of] bad faith are insufficient to defeat summary judgment." *Id.* Yet for everything other than the officers' allegedly gratuitous use of force against Cartia, conclusory allegations are all they have. The absence of

specifics dooms those claims. *See White v. Jackson*, 865 F.3d 1064, 1076 (8th Cir. 2017) (requiring "specific evidence of bad faith or malice" (citation omitted)).

## IV.

We accordingly affirm in part, reverse in part, and remand for further proceedings.

_____