# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3388

_____

Joel LeVine,[1]                                    *
                                                   *
    Plaintiff - Appellant,                     *
                                                   *  Appeal from the United States
v.                                                 *  District Court for the
                                                   *  Western District of Missouri.
Kathleen Roebuck; Tonya Youngs;                    *
Donald Greim,                                      *
                                                   *
    Defendants - Appellees.                    *

_____

Submitted:  May 15, 2008
Filed:  December 4, 2008

_____

Before LOKEN, Chief Judge, BEAM and BYE, Circuit Judges.

_____

LOKEN, Chief Judge.

In this § 1983 action, Missouri inmate Joel LeVine alleges that a correctional officer and two prison nurses violated his Fourth and Eighth Amendment rights by forcing him to undergo catheterization to avoid prison discipline when he could not provide a urine sample for a random drug test. The district court dismissed the Eighth Amendment claims on the merits, and the Fourth Amendment claims on the basis of

_____

[1]Though his attorneys spelled his name "Levine" in appellate pleadings, their client spelled his own name "LeVine" in his *pro se* § 1983 complaint and to the court reporter at his deposition. We will spell the name as LeVine himself spells it.

qualified immunity.  LeVine appeals.  Reviewing the grant of summary judgment *de novo*, we affirm.

## I.  Facts and Procedural History

In November 2004, Correctional Officer Tonya Youngs summoned LeVine, a sixty-eight year old inmate, to provide a urine sample for random drug testing being conducted pursuant to the Offender Substance Abuse Testing provisions adopted by the Missouri Department of Corrections in July 2004.  Part III.B. of this policy provided in relevant part:

> 2.    There shall be no physical contact between staff and offender during specimen collection.

> \*    \*    \*    \*    \*

> 4.    Offenders who refuse or fail to produce a urine specimen of at least 30cc (1 oz or half a bottle) within two hours will be subject to disciplinary action.

>> a.  The offender will be provided with approximately 12 ounces of water.

LeVine tried but failed to provide a urine specimen within two hours.  The parties disagree whether Youngs told LeVine he would lose visitation privileges and be placed in administrative segregation if he failed to provide a specimen.  They agree that LeVine told Youngs he suffers from an enlarged prostate, and that Youngs then called a prison medical officer, who verified LeVine's condition and advised Youngs to give him more time.  She allowed him another ten minutes and gave him more water to drink, but to no avail.  Youngs submitted an affidavit averring that "LeVine then volunteered to go to medical for catheterization in order to provide a urine

sample." Youngs called medical staff, who advised "it was ok for him to do this." LeVine was then escorted by correctional officer Patrick Dunlap to the medical unit.

LeVine submitted an affidavit averring, "Youngs instructed me that I would be taken to the hospital in order for a urine sample to be collected by catheterization." But at a prior deposition, he testified that, before entering prison, he had been catheterized by a private physician on two occasions when he could not urinate, and he was ambiguous on the question whether he volunteered to be catheterized:

> Q. If . . . it's Defendant Youngs' testimony that you made the offer to be catheterized, do you disagree with that?
>
> A. Did I -- that I agreed to it?
>
> Q. That you proposed the idea of being catheterized.
>
> A. No; because I had a swollen prostate and I got cancer. That's the only way I could keep from going to the hole. They would have put me in the hole if I didn't.

When they arrived at the medical unit, Dunlap told nurse Kathleen Roebuck that LeVine was there for catheterization so he could provide a urine sample for a drug test. There is some dispute whether LeVine consented to the procedure. Roebuck submitted an affidavit averring that, when Dunlap said LeVine wished to be catheterized, she "looked to Mr. Levine for confirmation," and he "shrugged and stated, 'Go ahead. I don't mind.'" On the other hand, LeVine testified:

> Q. . . . [I]sn't it true that you . . . did tell Kathleen Roebuck that you were agreeing to be catheterized at that time?
>
> A. No, I don't think so. I think Dunlap told her that he brought me over there for that purpose.

\* \* \* \* \*

Q.  So your testimony is that she then catheterized you against your will?

A.  I would say yes.  It's my . . . understanding after the fact that I was supposed to sign a paper giving them permission to do it but they never offered me one.

\* \* \* \* \*

Q. . . . Did you tell Kathleen Roebuck that you had any objections to being catheterized at that time?

A.  I wasn't given the opportunity to do that.

In the medical unit, Roebuck attempted to insert a catheter through LeVine's urethra into the bladder but encountered resistance, presumably because LeVine's urethra had been narrowed by his enlarged prostate gland.  Several times, Roebuck backed the catheter out and attempted to reinsert it.  LeVine claims he asked Roebuck to stop because the procedure was extremely painful.  Another nurse, Donnie Greim, attempted to assist Roebuck; he too was unsuccessful.  A medical unit physician was summoned and directed the nurses to cease.  When they withdrew the catheter, blood and tissue were evident on its tip.  LeVine was given antibiotics and pain medication and returned to his cell.  When he complained of continued pain and inability to urinate, physician Milo Farnham ordered him transferred to a public hospital, where he was successfully catheterized and provided a urine sample that tested drug-free.  At Dr. Farnham's direction, the catheter remained in place for as many as nine days.  LeVine had no complications or permanent injury after the catheter was removed.

After exhausting prison remedies, LeVine commenced this § 1983 damage action against Youngs, Roebuck, and Greim.  Defendants filed separate motions for summary judgment.  The motions assumed for summary judgment purposes that

-4-

Youngs threatened LeVine with a conduct violation and that LeVine did not consent to be catheterized. The district court granted the motions, concluding that defendants were entitled to qualified immunity from LeVine's Fourth Amendment claims and did not violate his Eighth Amendment rights. This appeal followed.

## II. Fourth Amendment Claims

LeVine first argues that the district court erred in granting defendants qualified immunity on his Fourth Amendment claims "because the right of a prisoner to be free from an involuntary catheterization as part of random drug testing" was clearly established at the time he was required to undergo this procedure. See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982) (qualified immunity standard). We agree with two principles on which this argument is premised. First, "state-compelled collection and testing of urine . . . constitutes a 'search' subject to the demands of the Fourth Amendment." Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652 (1995). Second, prison inmates are entitled to Fourth Amendment protection against unreasonable searches of their bodies, see Seltzer-Bey v. Delo, 66 F.3d 961, 963 (8th Cir.1995), although "a prison inmate has a far lower expectation of privacy than do most other individuals in our society." Goff v. Nix, 803 F.2d 358, 365 (8th Cir. 1986), cert denied, 484 U.S. 835 (1987); see generally Hudson v. Palmer, 468 U.S. 517, 525-28 (1984); Bell v. Wolfish, 441 U.S. 520, 558-60 (1979).

In Spence v. Farrier, 807 F.2d 753, 755 (8th Cir. 1986), we held that random urinalysis testing of inmates did not violate the Fourth Amendment because the prison system's security interest in detecting the unauthorized use of narcotics,[2] and the inmates' diminished expectations of privacy, justified a "truly random" procedure for

[2]"[T]he unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country." Block v. Rutherford, 468 U.S. 576, 588-89 (1984).

selecting the inmates to be tested. Spence did not involve use of the more intrusive procedure of involuntary catheterization to obtain a urine sample. That procedure was at issue in Sparks v. Stutler, 71 F.3d 259 (7th Cir. 1995), cert. denied, 519 U.S. 948 (1996), where prison officials ordered an inmate catheterized after they found a syringe in his shoe and he failed to provide a urine sample. The Seventh Circuit described catheterization as "more intrusive than a needle but less intrusive than a scalpel, making it hard to classify . . . under an objective reasonableness inquiry." Id. at 261. Without concluding whether a Fourth Amendment violation had occurred, the court reversed the district court's denial of qualified immunity. In Sparks, there was reasonable suspicion of drug use, a factor not present in this case. In another group of cases, exemplified by Tinius v. Carroll County Sheriff Dept., 321 F. Supp. 2d 1064, 1070, 1074-76 (N.D. Ia. 2004), courts have held that involuntary catheterization to obtain a urine sample for medical purposes -- such as determining the proper course of treatment -- does not violate the Fourth Amendment. Relying on these cases, defendants argue that LeVine's Fourth Amendment rights were not violated even if he was involuntarily catheterized to obtain a urine sample for a random drug test. We need not accept that argument to decide this case.

The district court rejected defendants' categorical argument and concluded that correctional officer Youngs violated LeVine's Fourth Amendment rights because "involuntary catheterization of a 68-year-old man with a history of prostate problems, as part of a random drug screening and without suspicion, is unreasonable" when other less intrusive options are available, such as keeping LeVine in a room until he was able to urinate. The court then granted Youngs qualified immunity because "the law of the Eighth Circuit was not clearly established at the time of [her] actions."

In Saucier v. Katz, 533 U.S. 194, 201 (2001), the Supreme Court held that, in deciding an issue of qualified immunity, a court must first consider a "threshold question": "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" If so, then

the court turns to the question whether the right was clearly established at the time in question. In recent cases, four Justices have urged that <u>Saucier</u>'s rigid "order of battle" be overruled. <u>See</u> <u>Brosseau v. Haugen</u>, 543 U.S. 194, 201 (2004) (Breyer, J., joined by Scalia and Ginsburg, JJ., concurring); <u>Bunting v. Mellen</u>, 541 U.S. 1019 (2004) (Stevens, J., respecting the denial of certiorari). In <u>Scott v. Harris</u>, 127 S. Ct. 1769, 1774 n.4 (2007), the majority declined to address "the wisdom of <u>Saucier</u> . . . because the constitutional question with which we are presented is . . . easily decided," but the concurring Justices again criticized "the order-of-battle rule."[3] Their criticism rests in part on the concern that, if the defendant loses the constitutional question but wins on qualified immunity, the rule "may immunize an incorrect constitutional ruling from review." <u>Id.</u> at 1780 (Breyer, J., concurring). That concern is present in this case, because the district court has posited a constitutional right that is both unprecedented in prior cases and so far removed from a plausible interpretation of the facts that it appears to be an impermissible advisory opinion. We need not resolve the dilemma, however, because the court's constitutional ruling depended upon an assumed fact for which there is no support in the record. Accordingly, applying the <u>Saucier</u> order of battle, we conclude that no constitutional violation has been shown without considering or approving the constitutional right posited by the district court.

The critical fact assumed by the district court was that correctional officer Youngs *ordered* the prison's medical professionals to perform an involuntary catheterization. Absent this fact, the record viewed most favorably to LeVine shows that Youngs threatened or warned LeVine that he would be subject to discipline for being unable to produce a urine specimen, which was consistent with § III.B.4 of the Department's drug testing policy. When LeVine could not provide a sample, Youngs could have returned him to his cell, written up his failure, and left to others the

---

[3]In granting certiorari in <u>Pearson v. Callahan</u>, No. 07-751 (Mar. 24, 2008), the Court directed the parties to brief and argue an additional question, "Whether the Court's decision in <u>Saucier</u> . . . should be overruled." The Court heard argument in <u>Pearson</u> on October 14, 2008.

ultimate question of discipline. Instead, after learning of his enlarged prostate from LeVine and the medical staff, Youngs directed correctional officer Dunlap to take LeVine to the medical unit for catheterization, a procedure LeVine had undergone twice before when he "couldn't urinate." LeVine's complaint and deposition testimony alleged, not that he refused the procedure, but that his consent or acquiescence was induced by the threat of prison discipline. But even if Youngs ordered LeVine to go to the medical unit, she had no contact with the medical professionals after he arrived and no authority to direct those professionals to undertake the catheterization procedure if they thought it medically inappropriate or if patient LeVine refused to consent. LeVine did not sue Officer Dunlap and makes no claim that he ordered the medical professionals to undertake the catheterization, an action that would have been beyond Dunlap's knowledge and authority. Liability for damages under § 1983 is personal. Doran v. Eckold, 409 F.3d 958, 965 (8th Cir. 2005) (en banc). The district court erred in concluding that Youngs violated LeVine's Fourth Amendment rights because LeVine presented no evidence that Youngs was personally responsible for any involuntary catheterization that occurred.

The district court concluded that the actions of nurses Roebuck and Greim as medical staff were objectively reasonable in light of clearly established law because they "were simply following a request from Youngs." Citing Sparks and Spence, LeVine argues that these nurses "were aware, or minimally should be aware, that an involuntary catheterization for a non-medical purpose is against a prisoner's 4th Amendment rights." But that proposition was not clearly established by those cases, or by any other. Given the undisputed evidence that LeVine had undergone voluntary catheterization in the past when he was unable to urinate, and that the nurses used proper technique in attempting this rather common and safe though painful procedure, the grant of qualified immunity must be upheld. See Sparks, 71 F.3d at 261.

LeVine further argues that the district court erred in granting summary judgment on his Fourth Amendment claims because Roebuck and Greim initially

sought summary judgment only on his Eighth Amendment claims. We disagree. The nurses' motion for summary judgment interpreted LeVine's ambiguous *pro se* complaint as asserting only an Eighth Amendment claim regarding their medical treatment. When LeVine's response clarified that he was asserting Fourth Amendment claims against all defendants, Roebuck and Greim addressed the Fourth Amendment claims in their reply memorandum. The district court construed the complaint as adequately stating Fourth Amendment claims against the nurses and resolved this fully briefed issue, which was well within its discretion.

### III. Eighth Amendment Claims

In the district court, LeVine's summary judgment memorandum clarified that he was asserting Eighth Amendment claims for defendants' alleged brutality, rather than for their deliberate indifference to his serious medical needs.[4] The standard for an Eighth Amendment brutality claim is whether force was applied "maliciously and sadistically for the very purpose of causing him." Berryhill v. Schriro, 137 F.3d 1073, 1076 (8th Cir. 1998). The district court granted summary judgment dismissing these claims, concluding there is no evidence that any defendant used force maliciously and sadistically for the purpose of causing LeVine harm. We agree. "One acts maliciously by undertaking, without just cause or reason, a course of action intended to injure another" and "sadistically by engaging in extreme or excessive cruelty or by delighting in cruelty." Howard v. Barnett, 21 F.3d 868, 872 (8th Cir. 1994)

---

[4]The record does not reveal a viable claim of deliberate indifference. Dr. Farnham submitted an affidavit averring that difficulty inserting a catheter into the bladder of a man with an enlarged prostate is not uncommon, that the nurses used proper technique in attempting to catheterize LeVine, and that it was proper medical treatment to successfully catheterize LeVine at the hospital and then leave the catheter in place for several days to allow his injury to heal. LeVine submitted no evidence or expert opinion to the contrary.

(quotations omitted).  In his deposition, LeVine admitted that defendants acted for the legitimate purpose of obtaining a urine sample for a random drug test.  He asserted that Roebuck "didn't know what she was doing," but not that she was attempting to hurt him.  He complained that Youngs threatened him with a conduct violation if he did not provide a sample.  These allegations fall far short of raising a genuine issue of material fact as to whether the defendants acted with a sufficiently culpable state of mind to support an Eighth Amendment brutality claim.

The judgment of the district court is affirmed.

_____