# United States Court of Appeals
### For the Eighth Circuit

———————————————

No. 22-2893

———————————————

Sease Michael Beard

*Plaintiff - Appellee*

v.

Doris Falkenrath, Warden, JCCC; Nathan Falter, CO III, JCCC; Carignan, CO I, JCCC; Jeremy Epps, former CO II, JCCC; Matherly; Graff; Jackie Petri; Todd Matthew; Jason Lewis; Mauler; Sonne; C. O. Dobbins; Bade

*Defendants - Appellants*

John Does, 1–5; Jane or John Doe, 6; Jane Doe, 7

*Defendant*s

Scott Kitner, Individually and in his capacity as a Jefferson City Correctional Caseworker

*Defendant - Appellant*

————————————

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

————————————

Submitted: September 20, 2023
Filed: April 4, 2024

————————————

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.

————————————

STRAS, Circuit Judge.

Sease Beard alleges mistreatment and retaliation by prison officials. We must decide whether qualified immunity shields their actions. For some claims yes, for others no, so we return this case to the district court for further proceedings.

I.

The Missouri Department of Corrections runs a prison outside Jefferson City. Inside is High-Security Unit 8, a wing reserved for inmates in administrative segregation, including Beard.

Unlike other inmates in this all-male prison, Beard has gender dysphoria and identifies as a transgender woman. Since at least 2019, Missouri has provided Beard with hormone-replacement therapy.

Beard's difficulties in prison have translated into a number of complaints and grievances. When an investigator was set to meet with Beard about one of them, a guard (Jeremy Epps) expressed disapproval of what Beard was wearing: pigtails and a homemade miniskirt. He told Beard to change clothes or else the meeting would not happen.

When Beard refused, the guard responded by slamming Beard to the ground. Two other guards (Carignan[1] and Nathan Falter) rushed over and helped him hold Beard down: one used pepper spray, and the other put on restraints.

Before long, several more guards (Matherly and five John Does) arrived. They cut off Beard's clothes, leaving only underwear, and then carried Beard

---

[1]The record does not contain first names for some of the guards. For them, we will use only their last names.

through the prison's hallways—in view of the other inmates—all while ignoring repeated requests for clothing. Eventually, they arrived at the "Rubber Room."

The "Rubber Room" is a holding cell for inmates on suicide watch. Once there, another guard (Graff) assisted the others in securing Beard to a restraining device called the "Wrap."

When the guards returned later, after an "extended period of time," they wheeled a still-restrained Beard out of the Rubber Room. It was only at that point that a guard provided a t-shirt. The ordeal finally ended when the officers returned Beard to a cell and removed the Wrap.

Beard sued nearly everyone involved in the incident, including supervisors and some John Doe defendants. *See* 42 U.S.C. § 1983. Beard claims that their actions violated state law and the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

Since then, Beard has had additional problems with the guards. Among other things, they have denied a promotion out of administrative segregation, refused to return personal property, and ransacked Beard's cell. Viewing these incidents as attempts at intimidation, Beard has added First Amendment retaliation claims against them.

The defendants, for their part, filed a motion to dismiss. *See* Fed. R. Civ. P. 12(b)(6). In it, they sought qualified immunity on most of Beard's claims. The district court denied the motion in its entirety.

## II.

The general rule is that denials of motions to dismiss, which are non-final orders, are not immediately appealable. *See Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 41–42 (1995). One exception, however, is when qualified immunity is at

issue. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). When it is, we have limited jurisdiction to decide whether it applies. *See Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007). Our review in these situations is de novo, *see Sandknop v. Mo. Dep't of Corr.*, 932 F.3d 739, 742 (8th Cir. 2019), but we must construe the allegations in the complaint as true and view them in the light most favorable to the plaintiff, *see Stanley v. Finnegan*, 899 F.3d 623, 625 (8th Cir. 2018).

Our limited jurisdiction allows us to answer two questions. First, do the allegations in the complaint make out a constitutional violation? *See Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc). And second, was the right clearly established at the time? *Id.* If the answer to either question is "no," judging the applicability of the defense from "the face of the complaint," *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005), qualified immunity applies. *See Morgan*, 920 F.3d at 523 (explaining that we may answer the questions in either order). Liability under section 1983 is personal, so we must answer these questions defendant-by-defendant and claim-by-claim. *See Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006).

### III.

Beard alleges First, Fourth, Eighth, and Fourteenth Amendment claims against the guards, challenging everything from the strip search to the denial of a promotion out of administrative segregation. Although many end here, some claims survive.

### A.

One that does is Beard's Fourth Amendment claim. According to the complaint, eight guards (Epps, Falter, Carignan, and five John Doe defendants) cut off Beard's "shirt, skirt, bra, and socks," while another (Matherly) recorded the incident, and one more (Graff) joined them in the Rubber Room. The complaint describes their actions as a "strip[]search"—one that was particularly "aggressive,"

"humiliating," "offensive," and "degrading." The guards, for their part, argue that any right Beard may have had under the Fourth Amendment was not "clearly established." *Story v. Foote*, 782 F.3d 968, 969 (8th Cir. 2015).

Although "prison inmate[s] ha[ve] a far lower expectation of privacy than . . . other individuals," the Fourth Amendment protects them from "unreasonable searches of their bodies." *LeVine v. Roebuck*, 550 F.3d 684, 687 (8th Cir. 2008) (citation omitted). The "scope, manner, and location" are what matter, *United States v. Williams*, 477 F.3d 974, 975 (8th Cir. 2007), and "[s]trip searches raise special considerations," *Robinson v. Hawkins*, 937 F.3d 1128, 1136 (8th Cir. 2019). "[E]vidence [of] . . . touch[ing,] . . . prodd[ing], . . . or [the use of] physical force . . . are important considerations in weighing the level of insult to personal privacy . . ." *Id.* at 1137 (some alterations in original) (citation omitted).

The guards' position throughout has been that the reasonableness of their actions does not matter because no search ever occurred. Their motivation, after all, was to have Beard change clothes, not discover anything hidden. Even if true, only their "objective behavior" counts. *United States v. White*, 928 F.3d 734, 741 (8th Cir. 2019); *United States v. Maple*, 348 F.3d 260, 263 (D.C. Cir. 2003) (examining whether "the objective effect of [an officer's] actions" infringed a reasonable expectation of privacy (quoting *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000))). And by any objective measure, forcibly removing someone's clothing is a search.[2] *Cf. Bell*, 441 U.S. at 558–59 (treating visual inspections of naked inmates as a search); *Peters v. Risdal*, 786 F.3d 1095, 1097 (8th Cir. 2015) (analyzing the forcible removal of clothing in a holding cell through a Fourth Amendment lens even though the guards wanted the detainee to change clothes).

---

[2]Besides, their own actions point to a different motivation. If their goal was to have Beard change into something less provocative, then why go further than necessary and cut off other clothing like socks? *Cf. Seltzer-Bey v. Delo*, 66 F.3d 961, 963 (8th Cir. 1995) (concluding there were sufficient allegations that the defendant conducted a search). A search is a plausible explanation. *Cf. Bell v. Wolfish*, 441 U.S. 520, 558–59 (1979).

The guards hardly discuss what comes next: whether the search was reasonable. *See Kentucky v. King*, 563 U.S. 452, 459 (2011) ("[A]ll searches and seizures must be reasonable."). There are two sides to the reasonableness coin. One is the "need" for it. *Smothers v. Gibson*, 778 F.2d 470, 473 (8th Cir. 1985). On that score, they all but admit there was not much of one. As they note, they were not looking for *anything*, much less something that posed a threat. *Cf. Bell*, 441 U.S. at 559 (allowing body-cavity searches because of the danger of inmates smuggling "money, drugs, weapons, and other contraband" by "concealing them in body cavities").

On the other side is the level of "invasion which the search entail[ed]." *Smothers*, 778 F.2d at 473. Beard alleges that the search went too far because *male* officers conducted the search and other inmates caught a glimpse of Beard's chest. Although we are skeptical that these facts alone could state a violation of the Fourth Amendment, *see Hill v. McKinley*, 311 F.3d 899, 903 (8th Cir. 2002), the search plausibly crossed the line in other ways. It included numerous guards, the use of pepper spray, the placement of a knee directly into Beard's back, and the forceful removal of Beard's clothes. *Cf. Robinson*, 937 F.3d at 1137 (denying qualified immunity on a strip-search claim in part because there was a material dispute of fact over whether the officer used "excessive force during the search"); *see also Evans v. Stephens*, 407 F.3d 1272, 1281 (11th Cir. 2005) (en banc) (explaining that "[u]nnecessary force" may contribute to a search's unreasonableness).

If the facts pleaded in the complaint are true, "reasonable official[s] in the defendant[s'] shoes would have [also] understood that [they] w[ere] violating" Beard's Fourth Amendment rights. *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (citation omitted). After all, in 2019, nearly two years before, we had concluded that a "degrading, humiliating, or abusive" strip search of an arrestee violated the Fourth Amendment. *Robinson*, 937 F.3d at 1138; *see Bell*, 441 U.S. at 560 (stating that "an abus[ive] [search] cannot be condoned"); *see also Franklin v. Lockhart*, 769 F.2d 509, 510–11 (8th Cir. 1985) (per curiam) (reversing summary judgment in an inmate strip-search case because the defendant did not address the

scope and manner of the searches). The allegations here are just as egregious, if not more so. At a minimum, the defendants have not established "qualified immunity [from] the face of the complaint." *Bradford*, 394 F.3d at 1015.

B.

Beard also alleges that the guards violated the Equal Protection Clause by engaging in gender-identity discrimination. Beard points to several examples, including a denial of the right to wear women's clothing, to have others use preferred pronouns, to be free from unnecessary force, and to have clothing on in view of other inmates.

We can address the qualified-immunity requirements in any order, and here we focus on the second one. *See Morgan*, 920 F.3d at 523. Even assuming the guards violated Beard's equal-protection rights, there was no "controlling authority [or] robust consensus of cases of persuasive authority" establishing that their actions violated the Constitution. *See Dean v. Bearden*, 79 F.4th 986, 989 (8th Cir. 2023) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

It is true that, after the events in this case occurred, we applied heightened scrutiny to Arkansas's ban on gender-transition therapy. *See Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022). A later iteration of the same case is currently pending before the en-banc court, *see* Order Granting Petition for Initial Hearing En Banc, *Brandt ex rel. Brandt v. Griffin*, No. 23-2681 (8th Cir. Oct. 6, 2023), but even if we apply *Brandt*, it could not have clearly established a right in *this* case. First, it postdates the guards' actions, and the clearly established inquiry "does not take into account later . . . changes in the law." *Graham v. Barnette*, 5 F.4th 872, 882 (8th Cir. 2021) (alteration in original) (quoting *Jackson v. Humphrey*, 776 F.3d 1232, 1242 (11th Cir. 2015)). Second, *Brandt* did not address the application of the Equal Protection Clause in the prison setting, an environment that presents its own unique challenges. *See Turner v. Safley*, 482 U.S 78, 84–85 (1987); *see also Quraishi v. St. Charles County*, 986 F.3d 831, 835 (8th Cir. 2021)

-7-

(explaining that "the burden to show that the[] right was clearly established at the time of the alleged violation" is on the plaintiff).

To the extent Beard argues that the guards violated the prison's own policy on transgender inmates, a policy cannot clearly establish a *constitutional* right. *See Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997) ("[T]here is no § 1983 liability for violating prison policy."). Only cases can. *See District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (requiring "a legal principle [to] have a sufficiently clear foundation in then-existing precedent"). And here, none did.

C.

Without a clearly established equal-protection right, Beard tries to fit the request to wear gender-identity-conforming clothing and to have others use preferred pronouns within a First Amendment "expressive[-]conduct" theory. *See Texas v. Johnson*, 491 U.S. 397, 403–06 (1989) (explaining expressive conduct). It does not work.

Just like our analysis of the Equal Protection Clause, we can assume without deciding that there was a violation and still conclude that there was no clearly established right. Take gender-identity-conforming clothing. No case establishes that an all-male prison must allow an inmate to wear a miniskirt. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cautioning courts against defining clearly established rights at a high level of generality); *cf. Molina v. City of St. Louis*, 59 F.4th 334, 341–42 (8th Cir. 2022) (concluding that wearing bright-green hats with the words, "National Lawyers Guild Legal Observer," emblazoned on them was not *clearly* expressive).

It is no answer to rely, as Beard does, on the general principle from *Turner v. Safley* that inmates "retain[] those constitutional rights not inconsistent with [their] status as a prisoner or with the legitimate penological interests of the corrections system." 482 U.S. at 95 (citation omitted). For one thing, *Turner* does not specify

*what* rights are consistent with an inmate's "status as a prisoner" or "the legitimate penological interests of the corrections system." *Id.* (citation omitted). For another, Beard's argument would effectively flip the qualified-immunity burden. Instead of having the plaintiff prove the right is clearly established, the defendants would have to *disprove* it by finding an absence of "controlling authority" or a "robust consensus of cases." *Dean*, 79 F.4th at 989 (quoting *al-Kidd*, 563 U.S. at 742). But we know the opposite is true: a plaintiff *always* bears the burden of showing "that a reasonable official would [have understood] that what he [was] doing violate[d]" a constitutional right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). And here, Beard cannot point to anything specific enough to clearly establish that prisons must allow inmates to wear gender-identity-conforming clothing.[3]

The same goes for the use of preferred gender pronouns. It is well-settled that insulting or derogatory comments are not actionable, in part because the speaker has a right to make them. *See Molina*, 59 F.4th at 343–44 (concluding that a profanity-laden and angry remark to police officers was "protected speech" (citation omitted)); *Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021); *see also Burton v. Livingston*, 791 F.2d 97, 99–100 (8th Cir. 1986) (noting that mere words, without more, do not invade a federally protected right); *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993); *Martin v. Sargent*, 780 F.2d 1334, 1338–39 (8th Cir. 1985). If the Constitution offers no protection against an insult or vulgar language, then how can it extend to the misuse of a pronoun?

The answer is it cannot. The guards may have been rude to Beard, and their statements humiliating, but the Constitution does not require prison officials to speak in a way an inmate prefers.

---

[3]The dissent suggests that the defendants never raised the clearly established law point before the district court. Not so. They asserted that there was nothing clearly establishing the right to wear gender-identity-conforming clothing in prison. Given that the burden was on *Beard* to prove that the right was clearly established, *see Davis v. Scherer*, 468 U.S. 183, 197 (1984), not the other way around, the defendants did not have to try and prove a negative to preserve their argument.

D.

Two guards (Bade and Dobbins) also request qualified immunity on an Eighth Amendment claim arising out of their failure to provide "necessary mental health treatment." Nearly a year after the Rubber Room incident, they refused to take Beard to an appointment.

"[D]eliberate indifference to [the] serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain" under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted). This type of claim has both an objective and subjective component. *See Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). Objectively, the medical need must be serious. *See id.* It must be "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citation omitted). And subjectively, a prison official must have "actually kn[own about], but deliberately disregarded" the need, *Dulany*, 132 F.3d at 1239, which is a mental state comparable to criminal recklessness, *see Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 360 (8th Cir. 2023).

What is missing here are allegations supporting the objective component, an "objectively serious medical need[]." *Plemmons v. Roberts*, 439 F.3d 818, 823 (8th Cir. 2006) (citation omitted). Beard's complaint is light on the details: it says that the session was "necessary" but does not say why, meaning there is not enough to determine whether a layperson would recognize that Beard had a need for it. *See Schaub*, 638 F.3d at 914. Nor does it tell us *who* thought the treatment was necessary, much less whether a medical professional had prescribed it. *See Orr v. Larkins*, 610 F.3d 1032, 1035 (8th Cir. 2010) (explaining that a prescribed treatment also qualifies). Without "further factual enhancement," we have no way of knowing whether the treatment was for an objectively serious medical need. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (holding, at

-10-

summary judgment, that an inmate's "bare assertion" did not "allege[] a serious medical need").

Unfortunately, counsel did not clarify matters much at oral argument. When questioned about the nature of the appointment, Beard's counsel answered that it was for "mental health," but he did not "know . . . what the appointment was for," at least without discovery. Even setting aside the fact that plaintiffs are in a unique position to know something about their own medical condition, filing a lawsuit "does not unlock the doors of discovery for a plaintiff" like Beard who is "armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.

To be fair, the complaint alleges *elsewhere* that Beard has been receiving hormone-replacement therapy for gender dysphoria. And we have recognized that "psychological disorders may constitute a serious medical need." *White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988). But here, the complaint requires us to speculate about whether the "mental health treatment" had a connection to gender dysphoria or the prescribed hormone-replacement therapy, and we will "not conjure up unpled allegations to save" the claim. *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 796 (8th Cir. 2021) (citation omitted). Indeed, Beard has *never* linked the deprivation of mental-health treatment to the hormone-replacement therapy—not in the complaint and not now—which suggests they are unconnected. Without a link, there is no constitutional violation alleged. *See Iqbal*, 556 U.S. at 679.

E.

Beard's next set of claims allege First Amendment retaliation by eleven guards, six individually named ones and five John Does. They each allegedly retaliated after learning that Beard had filed grievances and this lawsuit, which are "protected First Amendment activit[ies]." *Haynes v. Stephenson*, 588 F.3d 1152, 1155–56 (8th Cir. 2009) (citation omitted); *see Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013) ("The right to be free from retaliation for [using] the prison grievance process has been clearly established in this circuit for more than [thirty] years.").

-11-

In addition to identifying a protected First Amendment activity, a plaintiff bringing a retaliation claim must point to an adverse action "that would chill a person of ordinary firmness from continuing in the . . . activity," *Molina*, 59 F.4th at 338 (citation omitted), which itself must be "a 'but-for cause' of the injury [suffered]," *id.* (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)). And, of course, the final hurdle is overcoming qualified immunity: establishing "that it would have been 'sufficiently clear [to] every reasonable official . . . that what [they were] doing violate[d]' the First Amendment." *Id.* (alterations in original) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

There are multiple defendants and acts to unpack here. One guard (Falter) played a role in denying Beard's promotion out of administrative segregation. The same guard, along with another (Epps), restricted Beard's use of the showers. A different pair of guards (Bade and Dobbins) refused to take Beard to a mental-health appointment. And finally, several (Mauler, Sonne, and Dobbins) kept some of Beard's personal property.[4]

1.

Start with the decision to deny a promotion. After this lawsuit had been pending for several weeks, a three-member review panel had to decide whether Beard had earned a promotion out of the prison's highest-security unit. One of the guards named in the lawsuit (Falter) was on the panel and allegedly told Beard before

---

[4]The complaint also mentions a threat to transfer Beard to another prison. But this allegation appears only once in the complaint and is otherwise unsupported. There is also an allegation that "JCCC officials" placed Beard on involuntary suicide watch, but the complaint does not identify who did it, nor is the allegation made against a John Doe. Finally, someone, but it is "unclear" whom, allegedly ransacked Beard's cell and opened confidential legal mail during a meeting with counsel. According to the complaint, it could have been "one or more of the named . . . or John Doe Defendants." When it comes to retaliation, the John Doe defendants are not mentioned anywhere else. The parties and the district court did not address this allegation, so neither will we.

the hearing that he would ensure that the panel denied the promotion. Sure enough, a denial followed.

Life in the administrative-segregation unit is hard. There are no cellmates and strict limitations on the possession of personal property. Prisoners cannot leave their cells without shackles, eat in the dining hall, or use the gym. Not to mention that they spend all their recreational time in a cage. Given these restrictions, staying another 90 days in this unit, which is what Beard faced once the panel denied the promotion, "would chill a person of ordinary firmness from continuing in . . . [protected] activit[ies]." *Molina*, 59 F.4th at 338 (citation omitted); *cf. Nelson v. Shuffman*, 603 F.3d, 445, 450 (8th Cir. 2010) (concluding that placement in isolation in a structurally unfinished ward and denial of access to legal counsel, mail, family, recreation, and a phone was enough).

The threat itself also plausibly suggests that Beard's lawsuit was the but-for cause of the panel's decision. *See Santiago*, 707 F.3d at 994 (relying on a prison official's threat that "things are going to get worse" to conclude that a grievance was causally related to the decision to move a prisoner to a cell without personal property, running water, and bedding); *cf. Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994) ("[A] threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedures."). After all, there is little difference between a prison official's threat that "things are going to get worse," *Santiago*, 707 F.3d at 994, and the threat here, which was to keep Beard in administrative segregation for three more months. And just like in *Santiago*, the officer followed through on the threat to leave Beard in a worse living situation: a cell with more restrictions and fewer privileges. *See id.* (noting that the new cell had no running water or bedding, among other limitations).

Multiple cases, including *Santiago*, also would have placed prison officials on notice that responding to constitutionally protected activities with a retaliatory housing assignment violated the First Amendment. *See id.*; *Nelson*, 603 F.3d at 449–50 (placing a prisoner in an unfinished cell and taking away privileges); *Cooper v.*

*Schriro*, 189 F.3d 781, 784 (8th Cir. 1999) (per curiam) (shutting off running water in response to a grievance). It is true that "prison administrators may ordinarily 'transfer a prisoner for whatever reason or for no reason at all.'" *Cornell v. Woods*, 69 F.3d 1383, 1387 (8th Cir. 1995) (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983)). But the key word is "ordinarily": a transfer cannot be "in retaliation for the inmate's exercise of a constitutional right." *Id.*; *see Spencer v. Jackson County*, 738 F.3d 907, 912–13 (8th Cir. 2013) (denying qualified immunity to officers when there was a material dispute over whether a transfer would have occurred in the absence of a grievance). It follows that there can be no qualified immunity if retaliation, rather than some other legitimate justification, was the reason for the denial of Beard's promotion.

2.

The same goes for the allegation that two guards (Falter and Epps) cut off Beard's "access to showers." A reasonable inference, from the use of the plural "showers," is that it lasted for some time. The fact that a guard must be present in High-Security Unit 8 whenever inmates leave their cells only bolsters the inference that these guards played a pivotal role in limiting Beard's access. No guard, no shower.

The guards' position is that Beard did not have a right to "more showers." Viewing Beard's allegations that way draws all inferences in the wrong direction, in favor of the guards rather than Beard. The question is not "more showers," as the guards put it, but rather whether having multiple showers skipped, possibly for a while, is serious enough to state a retaliation claim. In our view, it "would chill a person of ordinary firmness from continuing in" their protected activities, *Molina*, 59 F.4th at 338 (citation omitted), even if it would not on its own "rise to the level of a constitutional violation," *Van Wyhe v. Reisch*, 581 F.3d 639, 658 (8th Cir. 2009).

There are also several reasons why the complaint plausibly alleges a retaliatory motive and causal connection. First, both guards were involved in the

-14-

Rubber Room incident, including the alleged search that preceded it, so Beard had already formally reported them. Second, the shower restrictions started about a week later. *See Charleston v. McCarthy*, 8 F.4th 772, 780 (8th Cir. 2021) ("[T]emporal proximity alone may establish causation where the time lapse between the protected activity and the adverse . . . action was two months or fewer[.]"); *cf. Skalsky v. Indep. Sch. Dist. No. 743*, 772 F.3d 1126, 1131 (8th Cir. 2014) ("[T]emporal proximity, *by itself*, cannot show retaliatory motive." (emphasis added)). Third, the guards do not identify a nonretaliatory reason for their actions, like an independent disciplinary violation. *See Spencer*, 738 F.3d at 913. And fourth, one of the guards (Falter) refused to transfer Beard out of administrative segregation, allegedly for a retaliatory reason. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (explaining that a "a pattern of antagonism coupled with timing" can establish a causal link). Although the evidence of retaliatory motive is thinner for one guard (Epps) than the other (Falter), it is not a stretch to infer that they worked together to take away Beard's shower access.

3.

Other guards (Sonne, Mauler, and Dobbins) worked together to confiscate Beard's personal property. What is supposed to happen is that the guards remove property from a cell when an inmate goes on suicide watch, only to return it once it ends. In this case, however, Beard alleges that "legal documents, personal mail, religious material, stamps, personal[-]hygiene items, and photographs" are still missing.

One plausible inference is that their actions were retaliatory. First, withholding these materials, which included some of Beard's most personal possessions, would chill a person of "ordinary firmness" from continuing to pursue a grievance or a lawsuit. *Molina*, 59 F.4th at 338 (citation omitted). Taking items like religious materials and personal mail is not "trivial." *Gonzalez v. Bendt*, 971 F.3d 742, 745 (8th Cir. 2020) (citation omitted) (applying the ordinary-firmness

test); *cf. Santiago*, 707 F.3d at 994 (noting, among other things, that the deprivation of personal property can be sufficient to chill an inmate).

Second, an inference of retaliatory motive and but-for causation follows from the nature of the materials, which included legal documents. Beard filed this lawsuit in early November, went on suicide watch in late December, and then had it end just a few days later, in early January. Temporal proximity is present, *see Charleston*, 8 F.4th at 780, and so is a connection between the allegedly missing items and the retaliatory motive. One possible inference, given that some of the materials are legal, is that taking them would make it harder for Beard to litigate this case. And importantly, there is no obvious nonretaliatory reason that explains the refusal to return them. *See Auer v. City of Minot*, 896 F.3d 854, 860–61 (8th Cir. 2018). Add the fact that unidentified guards—possibly "named Defendants or John Doe[s]"— opened other legal mail sitting in Beard's cell just two weeks later, and the claim crosses "the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (*Twombly*, 556 U.S. at 570); *see Lauren W.*, 480 F.3d at 267 (relying on timing plus "a pattern of antagonism").

4.

The only First Amendment retaliation claim that does not get past the pleading stage is the one against the two guards (Bade and Dobbins) who failed to provide "necessary mental health treatment." We have already explained that this allegation lacks "sufficient factual matter" to state an Eighth Amendment claim. *Iqbal*, 556 U.S. at 678. We reach the same conclusion under the First Amendment, except now the reason is that it does not establish a retaliatory motive or a causal link. There is also not enough detail to figure out whether missing a single mental-health appointment would deter "a person of ordinary firmness from continuing in the [protected] activity." *Molina*, 59 F.4th at 338 (alteration in original) (citation omitted). The complaint, in other words, fails to connect the required dots.

IV.

The claims against the five supervisors fare no better. Their allegedly unconstitutional act was "rubberstamp[ing]" the guards' actions by denying Beard's grievance. The defendants fitting into this category include a case worker (Jackie Petri), a unit manager (Todd Matthew), an assistant warden (a John Doe defendant), the warden herself (Doris Falkenrath), and a deputy director of the Missouri Department of Corrections (Jason Lewis). Beard also has a separate theory against the warden based on her alleged failure to "supervise [the prison guards] as to the treatment of transgender inmates . . . and . . . regarding proper search procedures."

It is black-letter law that government officials cannot be held liable under section 1983 for the wrongdoing of others. *See Iqbal*, 556 U.S. at 676. But they are accountable for their own misconduct, such as when they are "personal[ly] involve[d]" in a constitutional violation, *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (citation omitted), or when their own "inaction amounts to deliberate indifference to or tacit authorization of . . . violative practices," *id.* (citation omitted).

Beard's theory is that the constitutional violations were obvious, making the inaction of each of these officials a product of at least "deliberate indifference," if not a form of "tacit authorization." *Id.* (citation omitted). The problem is that the alleged violations were not as obvious as Beard thinks, and there is nothing in the complaint suggesting that the supervisors had previously seen any similar grievances, making it unlikely that they had "a highly culpable state of mind approaching actual intent" when they denied them. *Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir. 1993). At most, the "woefully deficient" responses were negligent, a reflection of a "lack of oversight" rising to a "breach of the standard of care," *Davis v. Buchanan County*, 11 F.4th 604, 627 (8th Cir. 2021). And negligence, as we already know, is not enough. *See id.* at 625.

Nor, based on the timing, could the supervisors' inaction have proximately caused Beard's *earlier* injuries. *See Parrish v. Bell*, 594 F.3d 993, 1002 (8th Cir.

2010). Recall the timing. Each of the denials came *after* the alleged mistreatment. To the extent Beard complains that they led to the search, use of the Wrap, or the denial of showers, they could not have. *Cf. Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir. 1989) (explaining that a "single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign supervisory liability"). The timing simply does not work.

Finally, to the extent Beard argues that the rubberstamping led to the *later* retaliation, Beard's grievance would not have placed the supervisors on notice that retaliation was ongoing or likely to happen. Nor "would [they] have understood" that denying the grievance was a retaliatory act. *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (citation omitted).

## V.

We accordingly affirm the denial of the motion to dismiss the Fourth Amendment claim against the guards, affirm in part on the First Amendment retaliation claims, but otherwise reverse.

KELLY, Circuit Judge, concurring in Parts I, II, IIIA, IIIB, IIIE, and IV; and dissenting as to Parts IIIC and IIID.

I concur in all but two portions of the court's opinion. I write separately regarding the First Amendment expressive-conduct claim and the Eighth Amendment claim brought against Bade and Dobbins.

-18-

I.

Beard's First Amendment expressive-conduct claim is grounded in the right to free expression through clothing and pronoun-use.[5] On appeal, Defendants argue that Beard did not have a clearly established First Amendment right to self-expression through clothing, and the court agrees. But Defendants did not make their First Amendment free-expression argument—or any argument on this claim—before the district court. "Ordinarily, we do not consider an argument raised for the first time on appeal." Peter Kiewit Sons', Inc. v. Wall St. Equity Grp., Inc., 809 F.3d 1018, 1022–23 (8th Cir. 2016) (quoting Orr v. Wal–Mart Stores, Inc., 297 F.3d 720, 725 (8th Cir. 2002)); see also Reps. Comm. for Freedom of the Press v. United States, 94 F.4th 746, 751 (8th Cir. 2024) ("We rarely consider arguments raised for the first time on appeal." (citing Fleck v. Wetch, 937 F.3d 1112, 1116 (8th Cir. 2019))). I would not do so here.

Defendants' choice not to make an argument about Beard's First Amendment expressive-conduct claim to the district court does not by itself bar us from considering that claim. But "[w]e consider a newly raised argument only if it is purely legal and requires no additional factual development, or if a manifest injustice

[5]To the extent this claim is based on pronoun-use, the court concludes Defendants are entitled to qualified immunity in part because the prison guards have the right to make insulting or derogatory comments to inmates. I disagree. When on the job and speaking with prisoners as part of their job duties, prison guards do not have a "right" to make derogatory comments or to misgender prisoners. See Garcetti v. Ceballos, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."); see also Janus v. AFSCME, Council 31, 585 U.S. 878, 908 (2018) ("[I]f the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." (citing Garcetti, 547 U.S. at 421–22, 425–26)). They are not in the same position as the protesters in Molina, who had a right to make profanity-laden, angry remarks to a police officer. See 59 F.4th at 342–43.

would otherwise result." <u>Peter Kiewit Sons'</u>, 809 F.3d at 1022–23 (quoting <u>Orr</u>, 297 F.3d at 725); <u>see</u> <u>United States v. Hirani</u>, 824 F.3d 741, 751 (8th Cir. 2016) ("We have addressed new arguments raised on appeal where the new issue is encompassed in a more general argument previously raised and no new evidence is presented on appeal." (citations omitted)); <u>Carter v. Huterson</u>, 831 F.3d 1104, 1107 (8th Cir. 2016) ("[D]efendants seeking dismissal under Rule 12(b)(6) based on an assertion of qualified immunity 'must show that they are entitled to qualified immunity on the face of the complaint.'" (quoting <u>Bradford</u>, 394 F.3d at 1015)). That is not the situation this case presents.

Here, Defendants' argument *does* require additional factual development because it relies on JCCC policies about inmate attire that are not in the Amended Complaint. On appeal, the substance of these policies is central to Defendants' argument: Defendants assert that the JCCC has a "gender-neutral clothing policy," that the miniskirt "violate[d]" it, and that Beard's expressive-conduct claim fails because "the First Amendment does not prevent the JCCC from imposing dress requirements." But we have only Defendants' bare assertions about the existence of the policy and that Beard's skirt violated it. We do not have the policy itself. We do not know what it means to say a policy is "gender-neutral," or whether a miniskirt violates any such policy as a "gendered" piece of clothing. And we have no way of assessing whether the policy is a reasonable one. <u>See</u> <u>Turner</u>, 482 U.S. at 89–91 (requiring assessment of several factors in assessing the validity of a prison regulation); <u>Payne v. Britten</u>, 749 F.3d 697, 701–02 (8th Cir. 2014) ("[A]ny analysis of the merits of the qualified immunity defense will require the district court to assess whether the regulation or policy at issue . . . is valid and neutral and whether it addresses a legitimate penological concern." (citation omitted)). So, at this point in the proceedings, we have insufficient information to assess the guards' conduct in implementing any such policy. <u>See</u> <u>Payne</u>, 749 F.3d at 702 (citation omitted) (stating that at the motion-to-dismiss stage, "[c]ourts may ask only whether the facts as alleged plausibly state a claim and whether that claim asserts a violation of a clearly established right").

Even if we were to consider Defendants' arguments as to this claim, the appropriate path would be to remand. On appeal, Defendants assign error to the district court's approach to the expressive-conduct claim, which they describe as combining the First Amendment free-expression and retaliation claims rather than addressing them separately. The district court's analysis was in response to Defendants' own briefing in support of their motion to dismiss. Defendants made arguments as to why Beard's Fourteenth Amendment clothing-based claim and why Beard's First Amendment retaliation claim both failed, but included no argument in support of why the First Amendment expressive-conduct claim also failed. It is understandable why the district court made no ruling on this claim: the parties did not brief it. If we do recognize Defendants' arguments, the district court should have the opportunity to address them in the first instance—especially because the disposition of this claim relies on extra-record information, namely JCCC's inmate attire policies. See GEICO Cas. Co. v. Isaacson, 932 F.3d 721, 724–25 (8th Cir. 2019) ("When a district court fails to address a matter properly presented to it, we ordinarily remand to give the court an opportunity to rule in the first instance. But we have refrained from remanding in cases where it is unnecessary on the record before us." (citations omitted)).

Nevertheless, this court reaches the merits of Beard's First Amendment expressive-conduct claim. But all we have to guide our analysis of this claim is Beard's allegation in the Amended Complaint that at the time the miniskirt was removed, "Beard was not violating any prison rules." And, that Beard was wearing the miniskirt to express a gender identity by way of clothing. See Cohen v. California, 403 U.S. 15, 18 (1971) (considering conviction for wearing jacket bearing expletive as "a conviction resting solely upon 'speech'" (citation omitted)).

Moreover, the court misapprehends the right at issue. We all agree it is Beard's "burden to show that [the] right was clearly established at the time of the alleged violation." Quraishi, 986 F.3d at 835 (citing Davis v. Scherer, 468 U.S. 183, 197 (1984)). And, "the right allegedly violated must be established . . . in a particularized sense so that the contours of the right are clear to a reasonable official," Young v.

Mercer Cnty. Comm'n, 849 F.3d 728, 735 (8th Cir. 2017) (quoting Reichle v. Howards, 566 U.S. 658, 665 (2012)). But here the asserted right is not the right of an inmate "to wear a miniskirt" in "an all-male prison." Rather, based on the Amended Complaint, the right allegedly violated is the First Amendment right to free expression by way of clothing.[6]

---

[6]Beard's wearing of a miniskirt does not by itself necessarily implicate this right. See Molina, 59 F.4th at 342 (analyzing "extent [to which] courts have recognized that clothing can convey a particularized message"). A person might wear a miniskirt "to convey a particularized message" to others. See Burnham v. Ianni, 119 F.3d 668, 674 (8th Cir. 1997) ("Nonverbal conduct constitutes speech if it is intended to convey a particularized message and the likelihood is great that the message will be understood by those who view it." (citing Spence v. Washington, 418 U.S. 404, 411 (1974))). Or they might not. Clothing choices are not necessarily made with the gaze or response of others in mind. But here, as Beard alleged in the Amended Complaint, just before the guards allegedly assaulted Beard and cut off Beard's clothes, Beard explained to Epps the message that Beard's clothing choice conveyed: gender expression. This makes Beard's wearing of the miniskirt—at least at this stage of the proceedings—expressive conduct. See Baribeau v. City of Minneapolis, 596 F.3d 465, 470–78 (8th Cir. 2010); Molina, 59 F.4th at 342 (describing the "anti-consumer-culture message" of protestors' costumes in Baribeau, 596 F.3d at 470–71, as "equally clear" as the "Fuck the Draft" message on the jacket in Cohen, 403 U.S. at 16). Any characterization of Beard's shirt, skirt, and bra as "provocative," supra at n.2, recognizes an expressive component to the wearing of these items of clothing. But according to the Amended Complaint, Beard told Epps the miniskirt was conveying an expression of gender. This is not the same as an expression of provocation. To the extent the word "provocative" suggests that Beard "provoked," or was complicit in, the actions the guards took, Beard pleaded just the opposite: that Beard "did nothing to provoke such a violent reaction [from the guards]." Making an inference that Beard's expression of gender was "provocative" is particularly concerning here, given that Beard identifies as a transgender woman. Cf. Am. Bar Ass'n, Resolution 113A and Report 1, 7 (2013), http://lgbtbar.org/wp-content/uploads/2014/02/Gay-and-Trans-Panic-Defenses-Resolution.pdf (urging curtailment of the practice of excusing crimes of violence on the grounds that the victim's sexual orientation or gender identity is to blame for provocation of a defendant's violent reaction).

To determine if this right is clearly established, "we look for a controlling case or a robust consensus of cases of persuasive authority." Thurmond v. Andrews, 972 F.3d 1007, 1012 (8th Cir. 2020) (quoting Dillard v. O'Kelley, 961 F.3d 1048, 1052 (8th Cir. 2020)). "There need not be a prior case directly on point, [rather,] 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Id. (quoting Dillard, 961 F.3d at 1052); "[T]he [Supreme] Court has recognized a wide array of conduct that can qualify as expressive, including nude dancing, burning the American flag, flying an upside-down American flag with a taped-on peace sign, wearing a military uniform, wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n, 584 U.S. 617, 657 (2018) (Thomas, J., concurring); see also Virginia v. Black, 538 U.S. 343, 358 (2003) (holding that the First Amendment protects both "symbolic or expressive conduct" and "actual speech," and collecting cases supporting this proposition); Baribeau, 596 F.3d at 477 (concluding plaintiffs were "engaged in protected expressive conduct" where they "dressed in zombie costumes, walked erratically, [] broadcasted anti-consumerism statements," and "intended to protest mindless consumerism"; under the "circumstances, the likelihood was great that the plaintiffs' artistic and symbolic message would be understood by those who viewed the protest"). Moreover, existing precedent, including that cited by Beard,[7] has placed it beyond debate that "prisoners enjoy freedom of speech and religion under the First and Fourteenth Amendments." Bell, 441 U.S. at 545 (citations omitted); see Turner, 482 U.S. at 84, 88–91 (recognizing that inmates retain their First Amendment rights). What matters is whether the contours of Beard's right to free expression by way of clothing would have been clear to a reasonable official, and here, they would have been.

If we were at summary judgment or beyond, the analysis would not end there, because Beard is an inmate in a correctional facility. According to Turner, inmates

---

[7]In opposing dismissal before the district court, Beard did not identify a case showing this right was clearly established because, as noted above, Defendants did not make any argument in support of dismissing the expressive-conduct claim.

"retain[] those [constitutional] rights that are not inconsistent with [their] status as a prisoner or with the legitimate penological objectives of the corrections system." 482 U.S. at 95 (quoting Pell v. Procunier, 417 U.S. 817, 822 (1974)). But given the procedural posture of the case, we cannot proceed to this next step. Without the JCCC policies in the record, we do not have any "legitimate penological objectives" that Beard's expressive conduct might be "inconsistent with" before us, and neither did the district court. See id. (quoting Pell, 417 U.S. at 822). Based on the Amended Complaint, and without the benefit of a developed record, this claim should survive a motion to dismiss.

## II.

Beard also sufficiently pleaded an Eighth Amendment claim against Bade and Dobbins for failing to provide necessary mental health treatment. The court concludes otherwise, saying Beard failed to allege an objectively serious medical need. I disagree.

As alleged in the Amended Complaint, Beard required "necessary mental health treatment," and was "diagnosed with gender dysphoria in 2017 and has been undergoing hormone replacement therapy since approximately December 2018 or January 2019." Beard also specifically described the "mental health treatment" that was denied as "medical care," stated that "Beard was incarcerated within the Missouri Department of Corrections system when [Beard] was diagnosed with gender dysphoria and . . . started [] hormone therapy," and alleged that "each Defendant was aware" of the gender dysphoria diagnosis. Of course, we may "not conjure up unpled allegations to save a complaint."[8] Warmington, 998 F.3d at 796 (citation omitted). But in reviewing a motion to dismiss, we must "draw all inferences in favor of the nonmovant." Johnson, 833 F.3d at 958 (citing Miller v. Redwood Toxicology Lab'y, Inc., 688 F.3d 928, 933 n.4 (8th Cir. 2012)).

---

[8]In that regard, I agree that Beard has not established the requisite causal link as to the First Amendment retaliation claim as brought against Bade and Dobbins in relation to this conduct.

A reasonable inference from the facts pleaded is that Beard's "necessary mental health treatment" was pursuant to a physician's diagnosis of gender dysphoria. And a physician's diagnosis obviates the need for a lay person's determination as to Beard's needs. See Estelle v. Gamble, 429 U.S. 97, 104–05 (1976) ("[D]eliberate indifference to serious medical needs of prisoners . . . [is] proscribed by the Eighth Amendment. This is true [where] the indifference is manifested by . . . prison guards . . . intentionally interfering with the treatment once prescribed."). This inference is further supported by the fact that the prison saw Beard's need for treatment as sufficiently serious to assign guards—here, Bade and Dobbins—to take Beard to the treatment. Moreover, this inference aligns with Defendants' understanding of Beard's claim, as in their opening brief Defendants assert that "[t]he right claimed [by Beard is] the right to timely 'necessary mental health treatment' for gender dysphoria . . . ." With this understanding of Beard's claim, Defendants link up Beard's diagnosed condition with the missed treatment.

Plaintiffs may be "in a unique position to know something about their own medical condition," but here, so too are the Defendants. Beard was in a prison, which has access to inmates' prison medical records—particularly relevant here, given Beard's receipt of the gender dysphoria diagnosis while incarcerated—and the prison likely even employs inmates' medical providers. And here, the prison knew enough about Beard's medical condition to schedule staff to take Beard to the treatment. Moreover, Beard alleged that "each Defendant was aware" of the gender dysphoria diagnosis. Beard indirectly—but sufficiently—connected the dots between the missed mental health treatment and the diagnosed gender dysphoria, and Defendants conceded their awareness of the treatment's purpose in their opening brief. To suggest that the prison scheduled staff members to take Beard to receive treatment for an undiagnosed condition, rather than inferring that such efforts were made for medically prescribed treatment for the mental health condition identified in Beard's Amended Complaint, impermissibly draws inferences in favor of the moving party. The Eighth Amendment claim could have been pleaded more explicitly, but the allegations are sufficient to survive a motion to dismiss.

_____